ARBER *v.* STAHLIN.

CLINK *v.* SAME.

PLAS *v.* SAME.

HEENAN *v.* SAME.

LADY *v.* SAME.

ZIMMERMAN *v.* SAME.

1. CONSTITUTIONAL LAW—FREEDOM OF SPEECH—FALSEHOODS AS TO PUBLIC OFFICIALS—MALICE.

The constitutional guarantee of freedom of speech prohibits a public official or a public figure from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not (US Const, Ams 1, 14).

REFERENCES FOR POINTS IN HEADNOTES

[1]  16 Am Jur 2d, Constitutional Law § 349.
     33 Am Jur, Libel and Slander §§ 80, 169, 274.
[2]  33 Am Jur, Libel and Slander §§ 161–169.
[3]  33 Am Jur, Libel and Slander § 161.
[4]  33 Am Jur, Libel and Slander §§ 297, 298.
[5, 7]  33 Am Jur, Libel and Slander §§ 236, 242, 272, 297, 298.
[6, 7]  41 Am Jur, Pleading § 342.
[7]  33 Am Jur, Libel and Slander §§ 292, 297.
[8]  5 Am Jur 2d, Appeal and Error §§ 1011, 1012.

2. WORDS AND PHRASES—PUBLIC FIGURE.

The term *public figure* is a person who by his accomplishments, fame, or mode of living, or by adopting a calling which gives the public a legitimate interest in his activities, affairs, and character, has become a public personage, that is, a celebrity.

3. LIBEL AND SLANDER—PUBLIC FIGURE.

A public figure stature must exist prior to the alleged libel and not by virtue of the notoriety created by it.

4. SAME—TRUTH—EVIDENCE.

Evidence presented on motion for summary judgment in libel action *held*, to present question for jury as to whether libelous document was published with an intent to cause harm through falsehood or in reckless disregard of truth or falsity of the statement.

5. SAME—CREDIBILITY OF DEFAMER—TRUTH.

The crucial and often determinative factor is credibility where actual malice of the defamer is alleged by averring that he knew the libelous statement to be false or acted in reckless disregard of its truth or falsity.

6. JUDGMENT—SUMMARY JUDGMENT—CREDIBILITY OF AFFIANT.

Summary judgment is not available whenever a presented issue of material fact turns upon the credibility of an affiant or witness whose deposition has been taken (GCR 1963, 117.2[3]).

7. LIBEL AND SLANDER—SUMMARY JUDGMENT—CREDIBILITY OF AFFIANT.

Credibility of affiants who supported motions for summary judgment should be a matter for determination by a jury in action for libel where affiants denied knowledge of falsity or reckless disregard of truth or falsity and denied that actual malice existed, as the determination of actual malice depends on more than a mere denial, being resolved from a study of the witness on the stand, his interest or lack of interest in the case, his role in the publication of the alleged libel and other factors making up the issue of credibility (GCR 1963, 117.2[3]).

8. COSTS—SUMMARY JUDGMENT—APPELLATE COURTS.

Costs of appellate courts are awarded to plaintiffs, where summary judgment for defendants in libel action was affirmed by Court of Appeals, but reversed and remanded by Supreme Court for further proceedings (GCR 1963, 117.2[3]).

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and J. H. Gillis and T. G. Kavanagh,

JJ., affirming Wayne, Rashid (Joseph G.), J. Submitted April 9, 1969. (Calendar No. 3, Docket Nos. 52,051–52,056.) Decided September 3, 1969. Rehearing applied for by named defendants denied October 6, 1969. Certiorari denied by the Supreme Court of the United States February 24, 1970.

10 Mich App 181, reversed.

Complaints by Patricia Arber, Allan B. Clink, Gerald A. Plas, Palmer T. Heenan, Karl Lady, and George M. Zimmerman against John H. Stahlin, Paul D. Bagwell, Martin S. Hayden, Evening News Association, and others for damages arising from the alleged publication of a libelous document. Summary judgments for the above-named defendants. Plaintiffs appeal to Court of Appeals. Affirmed as to the above-named defendants. Plaintiffs appeal. Reversed and remanded for further proceedings.

*Davidow & Davidow,* for plaintiffs.

*Warner, Norcross & Judd* (*Lewis A. Engman, Jerome M. Smith,* and *Roger M. Clark,* of counsel), for defendant Stahlin.

*Dykema, Wheat, Spencer, Goodnow & Trigg* (*Donald E. Shely* and *Mark H. Sutton,* of counsel), for defendant Bagwell.

*Butzel, Eaman, Long, Gust & Kennedy* (*George E. Brand, Jr.,* of counsel), for defendants Evening News Association and Hayden.

T. M. KAVANAGH, J. This appeal is from orders of the circuit court granting motions for summary judgments as to defendants, The Evening News Association, Martin S. Hayden, Paul D. Bagwell, and John H. Stahlin. The motions arose in six cases which were consolidated by order of the Court

of Appeals. The summary judgments were affirmed by that Court.

The original complaints in the six cases before us were filed in May, 1963. They arose out of a conflict between the plaintiffs, who were supporters of one Richard Durant, and certain leaders of the Republican party in Michigan, who allegedly were attempting to oust Durant from a position of influence within the party. The alleged libel was contained in a letter dated May 10, 1962, with an enclosure, mailed by then State Senator John H. Stahlin to the Michigan fair campaign practices commission, charging plaintiffs with improper activities.

Plaintiffs charge that the above-circulated documents were libelous in that the statements made, and the natural inferences to be drawn therefrom, charged the plaintiffs with being members of and/or associated with groups and/or persons whose activities were detailed as consisting of bribery, diversion of party funds, intimidation, misrepresentation, threats of physical violence, anti-Semitism, anti-Negro sentiments, violation of the American tradition of honesty, decency, and fair play, and Fascist, immoral, and reprehensible conduct.

Defendants filed their several motions for summary judgments.

The motions of defendants The Evening News Association and Martin S. Hayden were based upon: (1) Claimed privilege in the matter of "transmission of Senator Stahlin's letter and enclosure of May 10, 1962, to the chairman of the fair campaign practices committee, with copies to the members of said committee and to the press." (2) The publication by The Evening News Association of May 13, 1962, was privileged as a matter of law under the First and Fourteenth Amendments to the United States Constitution, and under Michigan Const 1963, art 1, §§ 3

and 5,[1] as being a matter of broad and general public interest. (3) The article did not name the plaintiffs and did not concern or libel plaintiffs as a matter of law. (4) There was no genuine issue as to any material fact and the undisputed facts show that defendants The Evening News Association and Martin S. Hayden did not act with actual malice toward plaintiffs. Attached to the motions were the affidavits of Frederick G. Engle, political writer for The Detroit News, and Martin S. Hayden, editor of The Detroit News. These affidavits, together with other affidavits hereafter mentioned, are contained in the appendix to this opinion.

The motions for summary judgments, with supporting affidavits, filed by defendants John H. Stahlin and Paul D. Bagwell relied upon GCR 1963, 117.2(3), alleging that there was no genuine issue as to any material fact in the action because the publication of the statements complained of was privileged and such statements were not libelous of the plaintiffs.

In answer to the several motions for summary judgments, plaintiffs filed the affidavit of defendant Charles Ferry.

The motions for summary judgments were granted and orders were entered in the various cases on behalf of each of the defendants.

Plaintiffs appealed to the Court of Appeals. The Court of Appeals affirmed the grant of summary judgments "for the reason that plaintiffs have failed to raise a genuine issue of fact as to the element of malice." 10 Mich App 181, 188.

Plaintiffs are here on leave granted. 381 Mich 767.

---

[1] Since the acts complained of occurred in May, 1962, Const 1908, art 2, §§ 2 and 4, were applicable.

This Court is requested—principally upon the authority of *New York Times Co.* v. *Sullivan* (1964), 376 US 254 (84 S Ct 710, 11 L Ed 2d 686, 95 ALR2d 1412)—to draw the fine line between speech unconditionally guaranteed and speech which may legitimately be regulated (see *Speiser* v. *Randall* [1958], 357 US 513, 525 [78 S Ct 1332, 2 L Ed 2d 1460]). This we cannot do.

The sole issue before this Court is whether summary judgments were properly or improperly granted. We hold that summary judgments were improperly granted.

While we agree with the lower courts that the *New York Times* standard relating to "public officials"[2] and its subsequent extension to "public persons"[3] is controlling if plaintiffs are in fact "public persons,"[4]

---

[2] *New York Times Co.* v. *Sullivan* (1964), 376 US 254 (84 S Ct 710, 11 L Ed 2d 686, 95 ALR2d 1412). The *New York Times* standard imposing constitutional limitations upon libel actions brought under State law is as follows (pp 279, 280):

"The constitutional guarantees require, we think, a Federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

[3] *Curtis Publishing Co.* v. *Butts* (1967), 388 US 130 (87 S Ct 1975, 18 L Ed 2d 1094), and its companion case, *Associated Press* v. *Walker* (1967), 388 US 130 (87 S Ct 1975, 18 L Ed 2d 1094). By a 5-to-4 vote the United States Supreme Court adhered "to the *New York Times* standard in the case of 'public figures' as well as 'public officials.'" See the concurring opinion of Mr. Chief Justice Warren, 388 US 162, 164, joined in by Justices Brennan, White, Black, and Douglas as to parts I and II.

[4] While not dispositionally relevant to the case before us, we note that the term "public figure" has been defined as a person who by his accomplishments, fame or mode of living, or by adopting a calling which gives the public a legitimate interest in his activities, affairs, and character, has become a "public personage," *i.e.*, a celebrity. See Prosser, Torts (3d ed, 1964), § 112, pp 844, 845; see, also, *Cason* v. *Baskin* (1947), 159 Fla 31 (30 So 2d 635); *Grayson* v. *Curtis Publishing Co.* (1967), 72 Wash 2d 999 (436 P2d 756); *Dietemann* v. *Time, Inc.* (CD Cal), 284 F Supp 925; *News-Journal Company* v. *Gallagher* (1967), — Del — (233 A2d 166). Of course, the public figure stature must exist prior to the alleged libel and not by virtue of the notoriety created by it.

we cannot agree with the conclusion that there is no question of fact as to " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See *New York Times, supra,* p 280.

Let us examine the facts presently before us. The affidavits of defendants Engle and Hayden state that their sole participation in the alleged libel was the publication of defendant Stahlin's request and complaint to the fair campaign practices commission and Mr. Durant's comments thereon. The affidavits of all defendants aver that the publication was without actual malice, but all tacitly admit knowledge of the content of exhibit "A".

On the other hand, we have the affidavit of defendant Charles Ferry, filed by plaintiffs, alleging that, as campaign manager for Stahlin, he was in close and constant communication with defendant Stahlin; that he knew Stahlin had been promised political support by certain party leaders if Stahlin would publicly attack Durant; and that The Detroit News, through Martin S. Hayden, would editorially support Stahlin in his campaign for lieutenant governor if he would publicly attack Durant.

Deponent Ferry further stated that—with this *quid pro quo* arrangement in mind to obtain the support of The Detroit News and the other defendants—he and Stahlin began gathering potentially damaging information and arranged to give defendant Engle of the News the "beat" on the story be-

---

Nothing in the record indicates that plaintiffs were in fact "public figures." In fact, defendant Hayden, who was the editor of the newspaper that published the alleged libel, and who was certainly in the best position to know the identities of "public persons" in the community, deposed that he "was not acquainted with plaintiff herein." We cannot agree with the circuit judge's facile reasoning that "some [of the plaintiffs] may have been, were, or are precinct delegates" and thus "a public person." This reasoning is unsupported by the proofs necessary to make such a finding of fact and is, at best, a conclusionary observation.

cause it was the only paper which was really after the "Durant thing."

Ferry's affidavit gives in detail the time and the information received in the subsequent meetings. Deponent tells of the enthusiastic support of defendant Bagwell in planning and executing the attack on Durant and the discussions with The Detroit News' representatives, including Engle, Robert Poppa, Carl Rudow, and Will Muller.

The end product of these meetings and political fact-gathering efforts with defendants and others was exhibit "A." The exhibit was presented to The Detroit News through Mr. Engle and Mr. Hayden on May 11, 1962, prior to publication. According to deponent Ferry, Mr. Hayden released him at that time from giving the News the "beat," because he wanted it to have the greatest circulation possible. The exhibit was then mimeographed and distributed to other news media and was published in The Detroit News on Sunday, May 13, 1962, prior to the mailing of exhibit "A" to the fair campaign practices commission.

The record indicates that defendants had complete control over releasing the news and that they could have released it at any time. We observe, however, that it was not "hot news" requiring immediate dissemination as in *Associated Press* v. *Walker* (1967), 388 US 130, 157 (87 S Ct 1975, 18 L Ed 2d 1094), but rather the type of news which by its very nature requires close scrutiny and careful verification (see *Curtis Publishing Co.* v. *Butts* [1967], 388 US 130 [87 S Ct 1975, 18 L Ed 2d 1094]).

Viewing all of the conflicting representations in the affidavits, could not a jury find or reasonably infer that defendants intended solely to "get Durant" and that they were not in the least concerned with plaintiffs, who were virtual anonymities in the

political area, or with the true facts regarding their participation in the Durant campaign? Could not a jury also find or reasonably infer that the hurried publication of the allegedly libelous document was indicative of a reckless disregard of whether it was true or not?

From these and other facts disclosed by the record, we find that reasonable minds could find or reasonably infer that the document was prepared and published with an intent to cause harm through falsehood or in reckless disregard of the truth or falsity of the allegations. See *Rose* v. *Koch* (1967), 278 Minn 235 (154 NW 2d 409). This creates a typical jury question.[4]

Where actual malice, in the sense that an alleged defamer knew the statement to be false or acted in reckless disregard of its truth or falsity, is alleged in any of the pleadings, the crucial and often determinative factor is credibility. As we have repeatedly emphasized, summary judgment is not available whenever a presented issue of material fact turns upon the credibility of an affiant or witness whose deposition has been taken. *Durant* v. *Stahlin* (*Appeal in re Van Dusen, Elliott, Romney*) (1965), 375 Mich 628, and cases cited therein.

It is simply not legally sufficient to say that since plaintiffs did not prove by their affidavits a publication with knowledge of falsity or reckless disregard of truth or falsity, the fact of actual malice did not exist. The determination of actual malice depends

---

[4] We note with great interest that it is more than mere coincidence that the Federal authorities have consistently, under both the *New York Times Co.* v. *Sullivan* and *Curtis Publishing Co.* v. *Butts* standards, refused to grant summary judgment (see, *e.g.*, *Goldwater* v. *Ginzburg* [SD NY, 1966], 261 F Supp 784; *Walker* v. *Courier-Journal and Louisville Times Company, Inc.* [CA 6, 1966], 368 F2d 189), or reviewed the case only after a full trial was held (see, *e.g.*, *New York Times Co.* v. *Sullivan, supra; Rosenblatt* v. *Baer* [1966], 383 US 75 [86 S Ct 669, 15 L Ed 2d 597]; *Curtis Publishing Co.* v. *Butts, supra*).

on more than a mere denial; it must be resolved from a study of the witness on the stand, his interest or lack of interest in the case, his role in the publication of the alleged libel, and the many other factors making up the issue of credibility.

We hold that where, as here, the credibility of a witness or deponent is crucial, summary judgment should not be granted.

The judgments of the Court of Appeals and the circuit court are reversed and the causes remanded for further proceedings.

Plaintiffs shall have costs of the appellate courts.

T. E. BRENNAN, C. J., and DETHMERS, BLACK, and ADAMS, JJ., concurred.

KELLY and T. G. KAVANAGH, JJ., did not sit.

APPENDIX.

"I, Frederick G. Engle, being duly sworn, depose and say:

"1. I have personal knowledge of the facts herein stated and I am prepared if sworn as a witness to testify fully and competently thereto.

"2. I am, and since prior to 1962 have been, a political writer for The Detroit News.

"3. I first saw Senator Stahlin's May 10, 1962 request that the fair campaign practices commission conduct a full-scale investigation into the activities of certain extremists groups in connection with the then forthcoming Republican primary election in Wayne county and the attached complaint (exhibit A to plaintiff's complaint) on Friday, May 11, 1962, when Senator Stahlin's press representative, Charles H. Ferry, delivered a copy thereof to the office of The Detroit News. I understood that there was a Michigan fair campaign practices commission, that Reverend Marshall R. Reed was its chairman, and that the persons shown as receiving copies of Senator Stahlin's request and complaint were the members of the commission. The commission conducted an investigation in response to the request and complaint.

"4. On May 11, 1962, Mr. Ferry had with him a stamped, sealed envelope addressed to the chairman of the commission which he said contained the original letter and complaint and which he was going to mail immediately. The copy of the letter and complaint which Mr. Ferry delivered to the News was for the use of the News as a public newspaper. I also understood that such copies were being delivered to the Detroit Free Press and to other news agencies. The

Detroit Free Press published an article regarding the request and complaint on May 13, 1962. A copy is hereto attached.

"5. On May 11, 1962 I read Senator Stahlin's request and complaint. I knew that Mr. Ferry was Senator Stahlin's press representative. I asked Mr. Ferry if he was able to substantiate the statements made in the complaint and Mr. Ferry said that he could. I also showed the request and complaint to Martin Hayden, editor of The Detroit News, and introduced Mr. Ferry to him.

"6. Neither I nor Mr. Hayden nor The Evening News Association had anything to do with the mailing of the request and complaint to the commission or its members. None of us distributed or published any copies of the letter or complaint. The only action taken by any of us was to publish, on Sunday, May 13, 1962, the attached Detroit News article concerning the request and complaint and Mr. Durant's comments thereon.

"7. Said article was written by me and was published by The Detroit News on the understanding that the request and complaint was that of Senator Stahlin to the Michigan fair campaign practices commission and had been sent to the commission on May 11, 1962. Before writing or publishing the article I called Mr. Durant and discussed the charges with him; the article contains his comments.

"8. At the time of the receipt of the copy of Senator Stahlin's request and complaint and at the time of the publication of The Detroit News article I did not believe that any of the statements contained in said request, complaint or article were false. I knew Senator Stahlin and had a high regard for his integrity, both personally and as a Michigan senator and candidate for lieutenant governor. In writing The Detroit News article I also relied upon this integrity and the assurance of Mr. Ferry that the charges made could be substantiated. My purpose in writing The Detroit News article was to inform the public of the filing of Senator Stahlin's request and complaint, a matter which I considered to be of broad and genuine public interest and concern. I was acquainted with the plaintiff herein and I had no personal animosity or malice toward him. My article does not mention the plaintiff herein. In mentioning the Republican Voters Associated as a group named by Senator Stahlin I understood that this group was a national political organization having hundreds of members.

"FREDERICK G. ENGLE."

"I, Martin S. Hayden, being duly sworn, depose and say:

"1. I am and since prior to 1962 have been, the editor of The Detroit News, a public newspaper published by defendant The Evening News Association.

"2. I first saw Senator Stahlin's May 10, 1962 request that the fair campaign practices commission conduct a full-scale investigation into the activities of certain extremists groups in connection with the then forthcoming Republican primary election in Wayne county and the attached complaint (exhibit A to plaintiff's complaint) on Friday, May 11, 1962, when Senator Stahlin's press representative, Charles H. Ferry, delivered a copy thereof to the office of The Detroit News. I understood that there was a Michigan fair campaign practices commission, that Reverend Marshall R. Reed was its chairman, and that the persons shown as receiving copies of Senator Stahlin's

request and complaint were the members of the commission. The commission conducted an investigation in response to the request and complaint.

"3. On May 11, 1962 Mr. Engle, a political writer for The Detroit News, brought a copy of Senator Stahlin's request and complaint to my office and introduced Mr. Ferry as Senator Stahlin's press representative who had delivered the copy to the News office. Mr. Ferry informed me that the request and complaint were being sent to the commission and copies were being delivered to the press.

"4. I had nothing to do with the mailing of the request and complaint to the commission or its members. I neither distributed nor published any copies of the letter or complaint. The only action taken by The Detroit News, Mr. Engle, or myself was the publication on May 13, 1962 of a news article written by Mr. Engle concerning Senator Stahlin's request and complaint and Mr. Durant's comments thereon.

"5. At the time of the receipt of the copy of Senator Stahlin's request and complaint and at the time of the publication of The Detroit News article I did not believe that any of the statements contained in said request, complaint or article were false. I did not question, and had no reason to question, the integrity of Senator Stahlin and I relied upon his integrity. I considered the filing of the request and complaint, and the matters referred to therein, as matters of broad and genuine public concern. I was not acquainted with the plaintiff herein and had no personal animosity or malice toward him. The article published by the News does not mention the plaintiff herein. I understood that Republican Voters Associated was a national political organization having a large membership.

"MARTIN S. HAYDEN."

---

"John H. Stahlin, being duly sworn, deposes and says:

"1. I am a defendant in the above-captioned cause.

"2. I make this affidavit in support of my motion for summary judgment in this cause, having personal knowledge of the facts stated herein.

"3. In May, 1962, I was serving as a member of the Michigan State senate. As a member of the Republican party, I also was a candidate for the Republican nomination for lieutenant governor.

"4. As a State senator, member of the Republican party, and candidate for State office, I knew in May, 1962, that Michigan had a fair campaign practices commission, the members of which were appointed by the governor. I further knew that the Michigan fair campaign practices commission investigated complaints of improper campaign practices and that the commission was officially charged with the responsibility of assuring that election campaigns in Michigan were conducted in accordance with American traditions of fair play.

"5. During the spring of 1962, I received information from Mr. Charles Ferry (a writer and research assistant employed by me), Mr. Paul Bagwell (a former Republican candidate for governor) and others concerning activities of certain groups in connection with the Republican party and a forthcoming primary election in Wayne county. Although I did not have personal knowledge of all of this information, I in good faith believed that such information was true. Aware of my responsibilities not only as a State senator and a

candidate for public office, but as an interested Republican and citizen, I believed it to be my duty to communicate this information to and file a complaint with the members of the Michigan fair campaign practices commission, the official group responsible for investigating such charges. On that basis this information was communicated to the Michigan fair campaign practices commission in substantially the form of exhibit A attached to the complaint in the above-captioned action. At the time of such communication I, in good faith, believed that the information contained in said exhibit A was true, and I still believe it to be true.

"6. At the time of said communication I also believed that the information contained in said exhibit A was a matter of vital public interest involving very basic threats to the political processes and that Republicans and the public generally should be advised of this information as soon as possible.

"7. In communicating the information in said exhibit A to the Michigan fair campaign practices commission and certain of the news media, I acted in complete good faith and with the conviction that such information was true and that in my position I had the responsibility and obligation to bring this information to their attention.

"8. At no time have I acted with any ill will or malice toward plaintiff in this cause, whose name was listed in said exhibit A as a person associated with Republican Voters Associated. It was my good faith belief that the plaintiff had first-hand knowledge of some of the information contained in said exhibit A and could testify to that effect before the Michigan fair campaign practices commission. To the best of my information and belief, no news article or other releases in connection with the filing of said exhibit A with the Michigan fair campaign practices commission have mentioned plaintiff's name.

"JOHN H. STAHLIN."

"Paul D. Bagwell, being first duly sworn, deposes and says that he is one of the defendants herein, that he has personal knowledge of the facts stated herein; and that, if sworn as a witness, he can testify competently to the facts contained herein.

"Deponent further says that:

"1. In 1958 and 1960 he was the candidate of the Republican party for the office of governor for the State of Michigan; that as such he was, in May, 1962, the titular head of the Republican party in the State of Michigan; that in such capacity, during and prior to May, 1962, he conferred with numerous officials, candidates and would-be candidates for State, county and local offices and for offices within the Republican party itself and that he received numerous written reports and requests for money from many of such persons and others on their behalf.

"2. On or about May 8, 1962, deponent received in his office in the Penobscot Building, Detroit, Michigan, one, Karl B. McKeehan, a long-time Republican worker and leader in the 13th Congressional District. Mr. McKeehan came into deponent's office without prior appointment and delivered to deponent two documents. The first document was entitled '13th in trouble as follows' and consisted of two pages; the second document was entitled 'Delegate Expenses' and consisted of two pages. During McKeehan's visit, deponent wrote

in his own hand on the first page of the document entitled '13th District in trouble as follows' the information following the names of the persons listed in items I and VI on said page and also wrote in his own hand the name 'George Zimmerman—14th,' opposite item II on said page and the names 'Clive Hull—Birch, 459 Prentiss' and 'John A. Smith, Birch, 382 Pilgrim, Highland Park' opposite item IV on said page, which information he obtained from said McKeehan.

"3. Shortly prior to McKeehan's visit, deponent had received from defendant Norman Stockmeyer, Wayne county, Republican chairman, a half-page carbon copy of a document entitled 'Greetings—Greetings,' with a query as to whether deponent knew anything about George Lincoln Rockwell and his connection with the American Nazi party.

"4. On May 10, 1962 deponent was visited in his office in the Penobscot building by defendants John H. Stahlin and Charles Ferry. At that time defendant Stahlin was a duly elected Republican member of the Senate of the State of Michigan and a candidate for the office of lieutenant governor of the State of Michigan. Defendant Stahlin at that time indicated that he had uncovered certain practices which he thought were harmful to the Republican party and that he had made a decision to file such charges with the fair campaign practices commission, a commission theretofore duly appointed by the governor of the State of Michigan. At that time, in response to such statement, deponent turned over to said defendants a copy of the document entitled '13th in trouble' and of the half-page document entitled 'Greetings—Greetings' previously received as set forth above. These documents were retyped in deponent's office on May 10, 1962, including the hand-written notations deponent had made in his conference with Karl B. McKeehan and a carbon copy was delivered to said defendants Stahlin and Ferry. A copy of the material so delivered to defendants Stahlin and Ferry is attached hereto as exhibit 1.

"5. At that meeting, Senator Stahlin indicated he had already made up his mind to bring the matter to the attention of the fair campaign practices commission and deponent turned over the document (exhibit 1 attached hereto) for the sole purpose of having the allegations therein contained brought to the attention of the fair campaign practices commission and with the sole expectation that such allegations would be investigated by such commission along with any other allegations which were going to be investigated.

"6. Deponent had no knowledge that defendants Stahlin and Ferry or any other person intended to or would publish the contents of said document other than as set forth above; he did not authorize publication other than as set forth above; and he delivered said document solely for the purpose of having such allegations investigated by the fair campaign practices commission, duly constituted for such purpose. Deponent never saw exhibit A attached to plaintiff's complaint at any time prior to its publication and deponent had no prior knowledge of its contents or that it would be published other than as set forth above.

"7. Deponent did not know that the allegations set forth in the material turned over by him to defendants Stahlin and Ferry were false and did not act with malice towards plaintiff or any other person but solely as one with an interest in the subject matter of such document and with good faith for the sole purpose of having an investigation made of the statements therein contained by the

duly authorized and constituted public authorities. Deponent had no knowledge of and did not authorize any other use of such document.

"8. Plaintiff has at no time requested this deponent to retract any statements made by him.

"Further deponent sayeth not.

"PAUL D. BAGWELL."

———

"Charles Ferry, being duly sworn, deposes and says:

"That he is one of the defendants in the above entitled cause, and that he has testified on deposition in the case of Durant v. Stahlin, et al., #328,488 to some of the matters involved in the above cause; that if sworn as a witness, he can testify competently to the facts contained in this affidavit.

"That during the spring and summer of 1962 deponent was in charge of the publicity on behalf of defendant John Stahlin, who was a candidate for the office of lieutenant governor on the Republican ticket for the State of Michigan, and that in the course of this duty he was in close and constant communication with defendant John Stahlin.

"That prior to May 10, 1962, defendant Stahlin told deponent that he had conversations and discussions with various party leaders and others, including Bill Kulsea of the Booth Newspapers, who had recommended to defendant Stahlin that he go after Richard Durant and attack him publicly.

"That defendant Stahlin informed deponent that Stahlin had talked to Martin Hayden, editor of The Detroit News, at the office of the News, and was told that if said Stahlin would make a public attack against Richard Durant, he would have the editorial support of The Detroit News in his campaign for lieutenant governor; that the first test for the News' support was the candidate's position on Durant, that such a public attack against Durant would help get rid of Durant in the 14th Congressional District, and therefore the News would support said Stahlin; that with his *quid pro quo* in mind, this deponent and defendant Stahlin began to get serious about taking some action as suggested.

"That deponent and defendant Stahlin then began to accumulate information which could be used in an attack on Richard Durant, and that deponent talked to Richard Van Dusen, Norman Stockmeyer, Elly Peterson, Jack Gibbs, Donald DeRosen, Glenn Engle and others to get such information and to see what their reactions were to such an attack.

"That prior to writing exhibit A, deponent talked to Glenn Engle of The Detroit News, and informed him that defendant Stahlin would in the future be making some sort of attack against Durant; that Engle then requested that The Detroit News be given a 'beat' on it because it 'was the only paper which was really after the Durant thing;' and that a determining factor in deponent's decision to write exhibit A was the knowledge that The Detroit News would give defendant Stahlin editorial support if he made the public attack.

"That deponent knew defendant Stahlin was under pressure from The Detroit News and others in the Republican party to take this action against Durant; that deponent had frequent discussions with Glenn Engle and other representatives of The Detroit News—for example, Robert Poppa, Carl Rudow and Will Muller—and knew of

Martin Hayden's attitude toward Richard Durant; that deponent knew from his conversations with Elly Peterson, Richard Van Dusen, Jack Gibbs, Norman Stockmeyer, Donald DeRosen and others that defendant Stahlin would get the support of the 'Romney crowd' if there was considerable publicity attached to his name in the publicity of these charges to be made against Richard Durant.

"That the subject of the attack, and the gossip to be used to make this attack (which later took the form of exhibit A) were discussed by deponent with Elly Peterson, Norman Stockmeyer, Jack Gibbs, Donald DeRosen, Richard Van Dusen, Herman McKinney, Paul Bagwell, Glenn Engle, and others in the Republican party, including then State Senator Stanley Thayer; that all of the above, with the possible exception of Stanley Thayer, confirmed the accuracy of the gossip which was later used in exhibit A; that all of them recommended that the attack on Richard Durant be made; and that Glenn Engle was compiling a file on all these things, the existence of which was another factor in deponent's decision to write exhibit A.

"That the strategy of using a complaint with the fair campaign practices commission to make the attack was specifically approved of by Jack Gibbs, Elly Peterson, Glenn Engle and Paul Bagwell and Norman Stockmeyer.

"That at some of deponent's regular meetings with defendant Stahlin in April, 1962, it was known and discussed that someone from the Ford Motor Company had gone down to Washington to induce Senator Barry Goldwater to denounce Richard Durant so that Durant would be cut off from the certain amount of respectability that being a supporter of Goldwater then had, and that this effort was undertaken as a planned part of the attempt to oust Durant from his position of leadership in the Republican party in the 14th District, which resulted eventually in the publication of exhibit A; that prior to May 10, 1962, at some of the 'dump Durant' meetings in Lansing with defendant Stahlin and others, the 'word' was out that Allen Merrill, a vice president of the Ford Motor Company, had said to 'get' Durant.

"That on Thursday, May 10, 1962, deponent and defendant Stahlin had a meeting with Paul Bagwell at the office of Paul Bagwell in the Penobscot building in Detroit, which lasted an hour to an hour and a half; that the primary purpose of the meeting was to get the advice of Paul Bagwell on the desirability and wisdom of making a public attack against Richard Durant; that deponent and defendant Stahlin knew that Bagwell was leading a group in the 14th District to oust Richard Durant; that the meeting discussed the situation in the 14th District in relation to ousting Durant; that Bagwell confirmed the accuracy of the information deponent and defendant Stahlin had been compiling and told them of the activities of his group, the Republican Action Committee; that Paul Bagwell said his group was also compiling information about Richard Durant; that Bagwell gave, without a request on the part of deponent or defendant Stahlin, certain documents which were used in exhibit A; that Bagwell was extremely enthusiastic about the plan to attack Durant through the fair campaign practices commission and said 'This would be a good thing for the party and our efforts (in the 14th District) and a good thing for you, John.'

"That at this meeting Paul Bagwell said that this proposed attack through the FCPC had 'good possibilities' and it would help his

group in their job of ousting Durant in the 14th District; that certain members of the Republican Action Committee (including George Bashara, Jr. and John Feikens) were digging on their own to get more of this sort of information to use in an attack on Richard Durant; that Bagwell strongly urged deponent to talk to said Bashara and Feikens before deponent made his public attack because they had additional charges 'to scorch your hair', but that deponent did not talk to them because he had to get exhibit A written in time to get it published in The Detroit News on Sunday, May 13, 1962.

"That deponent and defendant Stahlin believed the information given them by Paul Bagwell; that Bagwell told them his group would continue to investigate Durant and would come out with a further attack of their own subsequent to the publication of exhibit A, consisting of further disclosures of wrongdoing by Durant; that the purpose of these further disclosures, on the heels of exhibit A, was to give it 'the old one, two'; that the information deponent and defendant Stahlin had, which Bagwell confirmed, was already in the possession of George Bashara, Jr., and John Feikens, who were working on still more things; that deponent had certain notes of the gossip he had heard from others which he discussed at this meeting with Paul Bagwell, which Bagwell confirmed, and which was later used in exhibit A.

"That Bagwell, in his meeting and conversation with deponent and defendant Stahlin, was acting as a spokesman for the Republican Action Committee and his organized effort to oust Durant; that he consistently used the word 'we' in his references to the proposed attack and the efforts being made in conjunction with deponent's proposed disclosures; that Bagwell informed deponent and defendant Stahlin that it was 'a nasty situation' and 'something had to be done about it' and 'we are right behind you'; that going through the FCPC was much better than getting up on a podium or issuing a press release denouncing Durant, that this procedure lent it a little more dignity and substance and gave it a structure for the charges to be aired; that the action deponent and defendant Stahlin were proposing was consistent with what the Republican Action Committee was doing in the 14th District and that it would help the Republican Action Committee with their job; that the said Bagwell was the acknowledged leader of the anti-Durant-conservative movement in the 14th District; that in this meeting Bagwell made reference to the fact that he was working with others to accomplish their joint purpose of ousting Durant by attacks on Durant such as exhibit A; and that the material Bagwell gave deponent and defendant Stahlin was to be used as they saw fit, without any strings on it or requests having been made for it.

"That Bagwell assured deponent and defendant Stahlin they had the support of Bagwell and his associates in the publication and dissemination of the attack which later took the form of exhibit A, and that the Republican Action Committee would 'soon come forth' with additional disclosures of the same sort.

"That when deponent left Bagwell's office, after this meeting on May 10, 1962, he had no doubt whatsoever in his mind, as a result of the conversation with Bagwell, that the plans of deponent and defendant Stahlin to make the attack on Durant through exhibit A would be relayed by Bagwell to other members of the Republican Action Committee and other people, not formally members of RAC but interested in seeing such an attack made.

"That Bagwell was most enthusiastic, as a spokesman for his group, that somebody like deponent and defendant Stahlin were trying to 'flush out' Durant through such disclosures as were used in exhibit A; that this would be very beneficial to the interest of Bagwell's group; that in the area of disclosing information to deponent and defendant Stahlin, Bagwell was speaking for his group.

"That subsequent to leaving Bagwell on May 10, 1962, deponent returned to Lansing and wrote exhibit A, using material from the following sources:

"From Paul Bagwell—almost all of pages 2 and 3; forthcoming additional disclosures; improper use of party funds; racism and anti-Semitism; telephone intimidation; tampering with petitions; deceitful literature; meeting places and individual names; corroborating witnesses; general confirmation of all other items.

"From Glenn Engle—threats of physical violence, including the knife point incident; racism and anti-Semitism; corroborating witnesses; buying of candidates; general confirmation of all other items.

"From Donald DeRosen—threats of physical violence; improper use of party funds; buying of candidates; tampering with petitions.

"From Herman McKinney—threats of physical violence; intimidation; racism and anti-Semitism; corroborating witnesses.

"From Jack Gibbs—buying of candidates; improper use of party funds; general confirmation of all other items.

"From Norman Stockmeyer—improper use of party funds; threats of physical violence; buying of candidates; tampering with petitions; general confirmation of all other items.

"From nearly every facet of party leadership not heretofore mentioned—general confirmation of most if not all items. (By party leadership, deponent means a series of continuing conversations with individuals mentioned herein and others who expressed their alarm over the possibility of Richard Durant becoming chairman of Wayne county and supplied or confirmed gossip used in the preparation of exhibit A).

"That Paul Bagwell, at the meeting with deponent and defendant Stahlin hereinabove referred to, said that he had turned the information he presented to them over to George Romney and had urged Romney to make the disclosures earlier, but that Romney had refused, which refusal Bagwell characterized as an error, and that the reason Bagwell gave the material to deponent and defendant Stahlin was that it would help Bagwell and his associates in their coordinated and formally organized and sophisticated efforts to oust Durant from his position in the 14th District.

"That after writing exhibit A on the night of Thursday, May 10, 1962, deponent delivered copies to defendant Stahlin in the early morning of Friday, May 11, 1962, and then went directly to see Glenn Engle at the offices of The Detroit News; that an overriding consideration in writing exhibit A was to get publicity; that it was the consensus of deponent, Paul Bagwell and others that using the appeal to the fair campaign practices commission was a matter of publicity mechanics; that this was the most beneficial route to follow in terms of defendant Stahlin's position as a candidate; that filing charges before a government body is an event which was newsworthy, that deponent did not intend to, nor did he, mail a copy of the complaint to the fair campaign practices commission until after he had 'cleared' the timing with The Detroit News and made sure 'the skids were greased' there; that he wanted the Sunday cir-

culation for the airing of the charges and would have held off making the charges public if The Detroit News could not have given him space that day; that he made the charges public when he did because the newspaper strike had just ended—there was no point in taking action if the papers were not publishing; and that defendant Stahlin, Glenn Engle and The Detroit News were aware of these factors in his decision to make the charges at this time.

"Deponent further says that when he presented exhibit A to Glenn Engle, Engle skimmed over it and said, 'I had better check with the head man on this' indicating to the deponent that the decision as to whether to publicize it was too weighty for him to make alone; that Engle then took exhibit A to Martin Hayden, and that shortly thereafter deponent was also brought by Engle into Hayden's office; that Hayden released deponent from 'our' exclusive, saying he wanted this story to have the widest possible publicity— 'You are free to distribute this to other media'; and that deponent did not mail a copy of exhibit A to the fair campaign practices commission until after he had left a copy or copies with The Detroit News.

"That copies of exhibit A were mimeographed prior to deponent's visit to Glenn Engle aforesaid, and that after deponent's visit to The Detroit News, he gave copies to the Associated Press, United Press and The Detroit Free Press; that at least one copy was given on that Friday, May 11, 1962, prior to the appearance of the story about the charges on Sunday, May 13, 1962, to one Sarah Luedders (who had no connection with any news media) in the expectation that it would find its way into Durant's hands; that the rest of Friday and Saturday were spent in distribution of copies; that after Sunday, May 13, 1962, copies were given to a 'standard' PR mailing list, and to other individuals not connected with news media who requested copies, including members of the Republican State Central Committee; and that deponent was aware by Sunday, May 13, 1962, that Bishop Marshall Reed, the chairman of the fair campaign practices commission, had not received any copies of exhibit A by that day, and mailed him additional copies so that the FCPC received its copy well subsequent to May 13, 1962.

"That this widespread distribution, including the distribution to The Detroit News, was with the approval and knowledge of defendant Stahlin.

"That subsequent to the publication of exhibit A, deponent was informed by Arthur Elliott that it would be okay for him to use the threat of action by the banking commissioner against Durant; that a suit was started against Durant in Newberry, Michigan, which was publicized; that prior thereto, deponent was informed by Paul Bagwell that there would be some sort of action forthcoming regarding Durant's personal business transactions; and that defendant Stahlin informed deponent that Charles Slay, the banking commissioner, was in touch with defendant Stahlin, giving Stahlin information about Durant's personal business dealing with various banks of which Durant was a director, and had informed defendant Stahlin that the banking department was also 'going to get' Durant.

"And further deponent saith not.

"CHARLES FERRY"