Leonard SCHULTZ, Plaintiff,

v.

NEWSWEEK, INC., a New York Corporation, and the Evening News Association, a Michigan Corporation, Defendants.

Civ. No. 76–70372.

United States District Court,
E. D. Michigan, S. D.

Dec. 21, 1979.

Neal Bush, Mogill, Bush, Posner & Weiss, Detroit, Mich., for plaintiff.

James A. Smith, Bodman, Longley & Dahling, James E. Stewart, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for defendants; Rogers & Wells, New York City, of counsel.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

CORNELIA G. KENNEDY, District Judge.

Plaintiff brought this action for libel against defendants in Wayne County Circuit Court and defendants removed to this

court. Defendants now move for summary judgment.

The alleged libels occurred in one issue of *Newsweek* (Count I) and four newspaper stories in the *Detroit News* (Count II). Plaintiff alleges defendant Newsweek, Inc. (hereinafter Newsweek) libeled plaintiff in an article from its August 18, 1975 issue of *Newsweek* entitled "Where's Jimmy Hoffa?" by referring to plaintiff as a "Detroit Underworld figure". Plaintiff alleges defendant Evening News Assn. (hereinafter, Evening News) libeled plaintiff (a) in an article from the August 13, 1975 issue of the *Detroit News*, page 1–A, entitled "Hoffa 'Set Up' for a Rendezvous by Giacalone?" by referring to plaintiff as a "long-time underworld figure" and one of "the other two men named by law officials as those with whom Hoffa was to meet"; (b) in an article from the August 22, 1975 issue, page 4–A, entitled "Jury Probe a Last Hope in Hoffa Case" by referring to plaintiff as "a longtime underworld figure . . . (and) among those scheduled to meet Hoffa July 30"; (c) in the September 9, 1975 issue, page 3–A, by referring to plaintiff as an "underworld figure"; and (d) in the September 16, 1975 issue, page 3–B, by referring to plaintiff as a person who "has been named a key figure in the investigation into the disappearance of former Teamsters Union President James R. Hoffa."

Newsweek argues that its statement is privileged by the common law of Michigan and by the First Amendment. Since the story was of public concern, it argues plaintiff may only recover damages under Michigan law if he proves actual malice. It contends plaintiff is a public figure and must prove malice as a matter of constitutional law before he may recover for libel. Newsweek asserts that after exhaustive discovery of all evidence available on this issue no evidence of malice can be shown under either Michigan or federal constitutional law standards. The deposition of Mr. Schultz was taken over a long period of time. The depositions of Evening News reporters Wendland and Nehman were tak-

en twice. Thus, there is no disputed fact and summary judgment should be granted.

Evening News also contends its statements are protected by the common law of Michigan and federal constitutional law. Further, it contends the statements are true and truth is an absolute defense. The allegation regarding the August 22, 1975 issue was misstated; the article said plaintiff was "also reported to have been among those scheduled to meet Hoffa July 30", and as corrected, the Evening News asserts this statement is true.

Plaintiff argues he is not a public figure and defendants are not protected under federal constitutional law by *New York Times v. Sullivan*[1] standards. He insists the statements are not true and that Evening News cannot insulate itself from liability from publishing a libelous statement merely by saying someone else reported the statement. He argues that he has advanced enough evidence to create an issue of fact on the question of malice and therefore summary judgment should be denied.

Three issues have been raised by the motions: whether or not defendants have a qualified privilege under Michigan law; whether or not plaintiff is a public figure, giving defendants a privilege under federal constitutional law; and whether or not the statements are in fact true. A preliminary issue was also raised by the briefs: whether or not summary judgment is appropriate in a libel case when the issue of malice has been raised. Michigan courts have generally recognized actual malice as a jury question, *see Arber v. Stahlin*, 382 Mich. 300, 306–09, 170 N.W.2d 45 (1969), *cert. denied*, 397 U.S. 924, 90 S.Ct. 927, 25 L.Ed.2d 103; *Lawrence v. Fox*, 357 Mich. 134, 146, 97 N.W.2d 719 (1959), but federal courts applying Fed.R.Civ.Pro. 56 have granted summary judgment in cases involving questions of malice. *See Cervantes v. Time, Inc.*, 464 F.2d 986, 993 (8th Cir. 1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257; *Schultz v. Reader's Digest Assn.*, 468 F.Supp. 551, 564 (E.D.Mich.1979) (Freeman,

1. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

J.); *Rosanova v. Playboy Enterprises, Inc.*, 580 F.2d 859 (5th Cir. 1978). Moreover, the Michigan Supreme Court will affirm a grant of summary judgment even where malice is alleged if it is appropriate. *See Nuyen v. Slater*, 372 Mich. 654, 660, 127 N.W.2d 369, 373 (1964). The court said, quoting *Konkle v. Haven*, 140 Mich. 472, 478, 103 N.W. 850:

> The presumption in cases of privileged communications is that the person acts in good faith and from proper motives. If there is anything in the alleged libelous article or in the surrounding circumstances which shows a bad or vindictive spirit or a feeling of hatred or ill will, the question belongs to the jury. If there is not, it belongs to the court, as a question of law.

The court continued, quoting *Raymond v. Croll*, 233 Mich. 268, 275–276, 206 N.W. 556:

> The court should not permit dishonesty of purpose to be lightly inferred from acts which are just as consistent with good faith as with bad faith. If the circumstances relied on as showing malice are as consistent with its nonexistence as with its existence, the plaintiff has not overcome the presumption of good faith, and there is nothing for the jury.

372 Mich. at 660, 127 N.W.2d at 373.

 Under Michigan law, there is a qualified privilege to publish information which is in the public interest, which imposes a burden on plaintiff of proving defendants acted with actual malice. *See Orr v. Argus-Press Co.*, 586 F.2d 1108, 1113 (6th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773; *Schultz, supra*, 468 F.Supp. at 562; *Lawrence, supra*, 357 Mich. at 143, 97 N.W.2d 719; *Peisner v. Detroit Free Press, Inc.*, 82 Mich.App. 153, 163, 266 N.W.2d 693 (1978). The publisher of such information has this privilege whether or not the plaintiff is a public official. *See Schultz, supra*, 468 F.Supp. at 560–62; *Peisner, supra*, 82 Mich.App. at 161, 266 N.W.2d 693. Whether or not a communication is privileged is for the court to decide. *See Nuyen, supra*, 372 Mich. at 659, 127 N.W.2d 369; *Lawrence, supra*, 357 Mich. at 139, 97 N.W.2d 719.

 The *Newsweek* article and the August 13, August 22, and September 9 *Detroit News* articles were primarily concerned with the disappearance of James R. Hoffa, former President of the Teamsters Union and an internationally known labor leader. The articles discussed those he was supposed to meet on the day of his disappearance. Clearly, this was a matter of importance to the public. *See Schultz, supra*, 468 F.Supp. at 562.

The September 16 *Detroit News* article was not about Hoffa's disappearance but about plaintiff's sons who had filed a lawsuit against the Southfield Police Department and the state Liquor Control Commission which had refused to give them a liquor license for their Southfield Athletic Club. The license had been denied, according to the report, because the Commission believed plaintiff was a silent partner and that the club was a gathering place for a number of underworld figures. Since the distribution of liquor licenses is a public function, the public has a legitimate interest in who is applying for a liquor license and why such license is denied.

The articles in question, being articles within the public interest, are therefore qualifiedly privileged under Michigan law. Plaintiff, to prevail, must show a genuine issue of fact whether or not defendants acted with actual malice.

 As noted in *Schultz, supra*, the standard of malice to be applied to the Michigan qualified privilege is not entirely clear. Some cases suggest that the standard should be ill will, spite, or intention to injure the plaintiff. *See Bufalino v. Maxon Brothers, Inc.*, 368 Mich. 140, 153–54, 117 N.W.2d 150 (1962); *Nuyen v. Slater*, 372 Mich. 654, 661, 127 N.W.2d 369 (1964); *Timmis v. Bennett*, 352 Mich. 355, 367, 89 N.W.2d 748 (1958). However, none of those cases involved a newspaper defending its publication of a newsworthy item. The most recent Michigan Supreme Court decision on the question of malice did involve a newspaper defending its publication and

there the court applied the constitutional standard from *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which held that actual malice meant knowledge that the statement was false or publishing with reckless disregard of whether it was false or not. *See Arber, supra*, 382 Mich. at 305–06, 170 N.W.2d 45 (1970).[2] *See also Lawrence, supra*, 357 Mich. at 142–43, 97 N.W.2d 719 (1959); *Peisner, supra*. The Michigan Court of Appeals has applied the *New York Times* standard to one case which did not involve the press as a defendant, see *Wynn v. Cole*, 91 Mich.App. 517, 284 N.W.2d 144 (1979), but this court need not go so far in the present case. Relying on *Arber* and *Lawrence*, this court holds that under Michigan's common law plaintiff must establish a disputed issue of fact that defendants had actual malice as defined by *New York Times*—*i. e.*, that defendants had knowledge of the falsity of their statements or acted in reckless disregard to the truth or falsity of their statements.

With respect to Newsweek, plaintiff has not alleged nor produced any documents to support an allegation that Newsweek published its statement with knowledge of its falsity or in reckless disregard thereof. Plaintiff alleged the statement was "malicious" (Complaint, Count I, ¶ 4), but such an allegation is not sufficient to allege malice. *See Nuyen, supra*, 372 Mich. at 660–61, 127 N.W.2d 369. Both Jon Lowell (the reporter) and David Alpern (the author) deny any knowledge of falsity of their characterization of plaintiff as an underworld figure (Alpern, aff. ¶¶ 6, 7; Lowell, aff. ¶¶ 6, 9). The checking copy shows that the characterization of plaintiff was confirmed before publication (Alpern, aff. ¶ 6 and attached exhibit). Lowell tried to call plaintiff twice before printing the story (Lowell, aff. ¶ 7; Lowell, dep., p. 62). Lowell relied on discussions with law enforcement officers from the FBI, Detroit Police, and the Michigan State Police; other reporters and street contacts; daily Detroit newspapers and the *New York Times*; and the police record for plaintiff (the "rap sheet") (Lowell, dep., pp. 63, 64, 67, 77). However, Lowell made no attempt to call plaintiff at his business number (Lowell, dep., p. 62) or to check any official source other than the rap sheet (Lowell, dep., p. 81). The sources Lowell relied upon (see Newsweek's answers to Interrogatory No. 7(a)) were consistent with Lowell's definition of an "underworld figure" as "someone who has had more than an occasional brush with the forces of law and order" (Lowell, dep., p. 69) even though Lowell knew of no convictions of plaintiff since 1960 (Lowell, dep., p. 70). There is no evidence that Lowell should have known his definition was false.

Although reliance on the reports of others does not automatically shield one from liability, where the sources are reputable, the reports consistent, and no reason to doubt the veracity of the reports exists, reliance on the reports of others is justified. *See Schultz, supra*, 468 F.Supp. at 565. Plaintiff has not pointed to any evidence which would create an issue of fact as to whether or not Newsweek's employees believed their characterization of plaintiff was false, or whether or not they acted recklessly in regard to the truth or falsity of their statement. Thus, there is no evidence of malice on the part of Newsweek.[3]

2. One could read the *Arber* opinion as stating that the court would only apply the *New York Times* standard if indeed the plaintiff was a public figure. However, the court reversed the grant of the summary judgment because sufficient evidence had been raised to create an issue of fact whether defendants had actual malice under the *New York Times* standard even though the court noted nothing in the record indicated the plaintiffs were in fact public figures. See 382 Mich. at 305–06 & n.4, 170 N.W.2d 45.

3. Indeed, there is no evidence of any kind of ill will malice on the part of Newsweek's employ-

ees responsible for the characterization of plaintiff as an "underworld figure" either. Neither David Alpern, who wrote the article, nor Jon Lowell, who was the source of the characterization, expressed any ill will or spite towards plaintiff. (Alpern, aff. ¶ 8; Lowell, aff. ¶¶ 4, 8, 10; Lowell, dep., p. 42). Plaintiff admits that he does not know Lowell and that he has no reason to think anyone at Newsweek or working on the Newsweek article had any personal animosity towards him (Schultz, dep. May 24, 1979, pp. 131, 134–35).

With respect to defendant Evening News, the allegedly libelous statements fall into two categories—statements that plaintiff is an underworld figure and statements that plaintiff was reported to be among those Hoffa was supposed to meet on the day of his disappearance.

For the August 13 article, Robert Pavich and Michael F. Wendland relied upon newspaper clippings, reports from the Michigan State Police and Bloomfield Township police, and their own observations (Pavich, dep., pp. 34–35, 41–42; Wendland, dep. Sept. 22, 1977, pp. 27, 29–30, 33, 53; Wendland, dep. June 5, 1979, p. 13–14). For the August 22 article, they relied upon an FBI teletype (Pavich, dep., p. 41). Pavich or Wendland attempted to contact most of the people mentioned in the Bloomfield Township Police Report (Pavich, dep., p. 45), but neither talked to plaintiff (Pavich, dep., pp. 40–41; Wendland, dep. Sept. 22, 1977, p. 80). Pat Shellenbarger in writing the September 16 article relied upon the information contained in the lawsuit filed by plaintiff's sons, past news reports, and a discussion with Southfield's city attorney, but he did not talk to plaintiff, plaintiff's attorney, or plaintiff's sons (Shellenbarger, dep., pp. 17–20). John F. Nehman wrote the September 9 article based upon newspaper clippings, plaintiff's police record (the "rap sheet"), and his own observations, but did not talk to any law enforcement officers (Nehman, dep., pp. 28, 45–46, 63, 70).

The Bloomfield Township Police Report (August 31, 1975) stated that a Mr. Linteau, at whose place of business Mr. Hoffa stopped on the morning of his disappearance, in a subsequent interview revealed that Elmer Reeves, one of Linteau's employees, had recalled new and additional information concerning subjects Mr. Hoffa had stated he was going to meet August 30. According to Mr. Linteau, Elmer now felt the names mentioned were Leonard Schultz, Tony J. (Tony Giacalone), and another Tony. The report further stated Elmer Reeves was going to seek the assistance of a psychiatrist to determine whether or not he can effectively recall the names Hoffa said he was going to meet (Exhibit C, tab 3, Evening News' Motion for Summary Judgment). Wendland's notes of an August 13, 1975 FBI teletype indicate that under hypnosis, Linteau said he was told by Hoffa he was going to meet Tony G. and Lennie Schultz (Exhibit C, tab 4, Evening News' Motion for Summary Judgment). Schultz said he made a public denial of any scheduled meeting with Hoffa (Schultz, dep. November 17, 1977, pp. 70–72), and the reporters knew he denied any meeting (Nehman, dep., pp. 33, 68; Pavich, dep., pp. 50–51), although Wendland did not learn of plaintiff's denial until after co-authoring the August 22 article (Wendland, dep. Sept. 22, 1977, p. 81). But Schultz admitted he was questioned by the FBI who said his name was mentioned under hypnosis (Schultz, dep. November 17, 1977, p. 74), trailed by the police during the Hoffa investigation (Schultz, dep. July 21, 1978, p. 15), questioned by the FBI about ten times concerning the Hoffa investigation after Hoffa's disappearance (id., pp. 18, 36, 48), and testified before the grand jury about the Hoffa disappearance (Schultz, dep. Nov. 17, 1977, p. 71).

■ The depositions and exhibits establish that the reporters had no knowledge that the fact reported—namely that law enforcement officials linked plaintiff with the Hoffa disappearance—was false or that they acted in disregard of that falsehood. Plaintiff points to nothing to the contrary. True, none of the authors contacted plaintiff about their statements regarding him, but the failure to investigate has been held not sufficient to prove reckless disregard for the truth. *See Beckley Newspapers v. Hanks*, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).

Plaintiff argues that the court must consider whether the reporters knew whether the alleged linkage was false, not whether the reporters knew that the alleged linkage was reported. Otherwise, defendants could republish any libelous statement they want-

ed by merely prefacing the statement with an acknowledgement of an external source. This court need not reach the republication issue. The fact that law enforcement officials name someone as connected with an incident or as a suspect is by itself a fact within the public interest. The public has an interest in who, what, when, where, and how the police are investigating the disappearance of such a prominent person as James R. Hoffa. Since there is no evidence of knowledge of falsity or reckless disregard thereof with respect to this category of statements, there is no material issue of fact.

Nor has plaintiff demonstrated an issue of fact with respect to the characterizations of plaintiff as an underworld figure. Wendland defined an underworld figure as someone with a long history of criminal convictions and associations (Wendland, dep. Sept. 22, 1977, pp. 65–66). Nehman defined an underworld figure as "[s]omeone who has ties to the underworld in connection with a criminal past himself and an ongoing association or closeness or contact with those who likewise have criminal records or who may be engaged in unlawful activities" (Nehman, dep., p. 46). The reporters were aware of plaintiff's criminal record (Pavich, dep., p. 38; Wendland, dep. June 5, 1979, p. 4; Wendland, dep. Sept. 22, 1977, p. 65; Nehman, dep., p. 45), although they were also aware his criminal record ended in 1960 (Pavich, dep., p. 38; Wendland, dep. June 5, 1979, p. 5; Nehman, dep. p. 48). Schultz admits his criminal record extends from 1944 to 1960, involving convictions for such crimes as receiving stolen property, larceny from a dwelling, and arson (Schultz, dep. May 17, 1977, pp. 40–100). That plaintiff was friends with Anthony Giacalone was known to all and admitted by Schultz (Nehman, dep., pp. 24, 46, 52–53; Wendland, Sept. 22, 1977, pp. 44–45, 46; Wendland, dep. June 5, 1979, p. 10; Schultz, dep. July 11, 1978, pp. 65, 123–24; Schultz, dep. May 24, 1979, pp. 99–105). Giacalone was known as a major organized crime figure (Wendland, June 5, 1979, p. 8); even plaintiff did not want to meet Mr. Giacalone at first because of his reputation

(Schultz, dep. May 24, 1979, p. 96). He was also friends of others with criminal records such as Vito Giacalone and Max ·Stern (Schultz, dep. July 11, 1978, p. 125; Schultz, dep. July 21, 1978, pp. 100, 81–83). Wendland was not aware of any business between plaintiff and Giacalone nor of any organized crime figures having an interest in Joshua Doore or Sanitas, two companies with which plaintiff had business associations (Wendland, June 5, 1979, pp. 10–13) and Nehman had no knowledge of illegal activity with respect to plaintiff's business of being a labor consultant or owning nursing homes (Nehman, dep., pp. 56–57), but Wendland mentioned a business deal between plaintiff and a Mr. Licavoli (Wendland, dep. June 5, 1979, pp. 6–7). Plaintiff, in his affidavit, states he told Wendland that his last criminal activity was in 1959, he is only a social friend of Giacalone, and he never had business deals with the underworld (Schultz, aff., ¶ 4), but Schultz admitted to putting Max Stern's vending machines in his nursing homes (Schultz, dep. July 21, 1978, pp. 81–83), loaning Loccrichio about $129,000 (Schultz, dep. July 21, 1978, pp. 105–111; Schultz, dep. May 24, 1979, pp. 73–74), and that he had a business meeting with Anthony Giacalone, Vito Giacalone and Quassarano (Schultz, dep. May 24, 1979, pp. 53–55). Nehman testified that he and Wendland went to the Southfield Athletic Club to see who they could see and they saw Mr. Giacalone and plaintiff having lunch. Nehman testified that he heard or by reading Giacalone's lips understood him to tell plaintiff, "Well, you're going to take the Fifth on the finances, aren't you?" and "If they take you before the judge, it will be your best recollection." (Nehman, dep. pp. 28–29).

The record thus shows the reporters characterized plaintiff consistently with their definitions of underworld figure. The record does not show that they should have known or in fact knew their definition of underworld figure was faulty or that their characterization of plaintiff was false. Under the *New York Times* standard, plaintiff has not created an issue of fact whether or

not the Evening News possessed the requisite malice.[4]

■ Plaintiff has not shown that either defendant published the allegedly defamatory statements with actual malice. Since the statements are protected under Michigan law by a qualified privilege unless published with actual malice, plaintiff has failed to show a material issue of fact is in dispute.[5] Therefore, this court must grant both defendants' motions for summary judgment.

Defendant Newsweek's motion for summary judgment is GRANTED. Defendant Evening News Association's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

---

4. Nor does the record show any ill will or spite. None of the authors have admitted that they bore any ill will toward plaintiff. Pavich wrote the August 13 article before he had ever met Schultz (Pavich, dep., pp. 36–37)., Plaintiff did not know if Pavich had any animosity towards him, but he insisted Wendland and Nehman did (Schultz, dep. May 24, 1979, pp. 137–44). That Wendland talked to plaintiff at his house on a pretext of discussion about rose gardens; that Wendland described plaintiff as bare-chested with bulging muscles, wearing a diamond identification bracelet while gardening (like a "gangster", plaintiff complains); that Wendland described plaintiff in a rough draft of a book as a "mobster" are the facts plaintiff relies upon to say Wendland bears him ill will. That Nehman hangs around the grand jury room to see who goes in and who comes out, that Nehman told the grand jury he had seen Giacalone tell plaintiff to take the fifth, and that Nehman hated anyone with a record are the facts which plaintiff claims show Nehman's animosity. However, the article describing plaintiff in the garden did not use the word "gangster" and described plaintiff as wearing the identification bracelet at lunch at the Southfield Athletic Club (Exhibit A, tab 18, Evening News Association's Motion for Summary Judgment). Moreover, plaintiff wore the bracelet to the deposition (Schultz, dep. May 24, 1979, p. 143). Schultz gives no factual support for his allegation that Nehman told the

grand jury that Giacalone told him to take the fifth other than that he was called before the grand jury, he did take the fifth and apparently he was asked if Giacalone told him to take the fifth. However, the grand jury might have questioned him whether or not Nehman spoke to it as the police report had listed Schultz as among those Hoffa was scheduled to meet the day of his disappearance and plaintiff made no secret of his friendship with Giacalone. Assuming that Nehman told the grand jury about what he believed Mr. Giacalone told Mr. Schultz that act does not show a "bad or vindictive spirit".

All the actions of the reporters that plaintiff points to are as consistent with good faith as with bad faith. Nehman and Wendland may bear him ill will or may be just zealous reporters. "If the circumstances relied on as showing malice are as consistent with its nonexistence as with its existence, the plaintiff had not overcome the presumption of good faith, and there is nothing for the jury." *Nuyen, supra,* 372 Mich. at 660, 127 N.W.2d at 373.

5. The defendants' articles are protected by the qualified privilege under Michigan law. Since the articles are so protected, this court need not decide whether plaintiff is a public figure such that these articles would be protected under federal constitutional law or whether the allegedly libelous statements are in fact true.