district court must afford the defendant a plenary form of hearing.[10]

Our analysis of the dispute as to liability convinces us that Au's claims are sufficiently adverse to warrant a trial in the district court and not in the bankruptcy court. Au contends that the liability arguments in its counterclaims raised substantial adverse claims. Atlas asserts that the district court's summary judgment orders disposed of Au's defenses and thus the bankruptcy court was only required to liquidate the contract damages. Our decision to remand this case for a new trial indicates that Au has substantial claims as to liability. Moreover, the vigorous and protracted litigation and the lower courts' careful and detailed adjustment of the level of damages indicates that the defendant has colorable claims as to damages. The presence of substantial claims in this litigation preclude the bankruptcy court from exercising its jurisdiction. The existence of adverse claims concerning liability and damages requires a plenary proceeding; accordingly, we must remand this case to the district court for trial.

REVERSED AND REMANDED.

Leonard SCHULTZ, Plaintiff-Appellant,

v.

NEWSWEEK, INC. and The Evening News Association, Defendants-Appellees.

No. 80–1090.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 5, 1981.

Decided Jan. 18, 1982.

Irwin M. Alterman, Hyman, Gurwin, Nachman, Friedman & Winkelman, Roger Leemis, Southfield, Mich., for plaintiff-appellant.

Bodman, Longley & Dahling, James A. Smith, Detroit, Mich., James E. Stewart, R. Rassel, James Smith, James Stewart, Detroit, Mich., for defendants-appellees.

Before LIVELY and ENGEL, Circuit Judges, and WHITE,\* District Judge.

LIVELY, Circuit Judge.

The plaintiff appeals from summary judgment for both defendants in an action in which he sought damages for alleged defamation. The action was filed in a state court and removed to the district court on the basis of diversity of citizenship. All parties agree that the substantive law of Michigan is applicable and the plaintiff also contends that the Michigan rule pertaining to treatment of summary judgment motions should have been applied.

## I.

### A.

In his complaint the plaintiff charged that he was libeled by a reference to him in the August 18, 1975 issue of *Newsweek* as a "Detroit underworld figure." The article in which the reference appeared concerned the disappearance of former labor leader James R. Hoffa on July 30, 1975 and was entitled, "Where's Jimmy Hoffa?" The complaint also charged that the plaintiff was libeled by references to him in news articles published by the defendant Evening News Association in the August 13, 1975, August 22, 1975, September 9, 1975 and September 16, 1975 issues of *The Detroit News.* The first three news articles concerned the Hoffa disappearance and the September 16th article detailed the problems being encountered by the plaintiff's two sons in attempting to obtain a liquor license for a private club which they owned and operated.

In the August 13th article entitled, "Hoffa 'set up' for rendezvous by Giacalone?" plaintiff was referred to as a "long-time underworld figure" and one of "the other two men named by law officials as those with whom Hoffa was to meet." In the August 22nd article, "Jury probe a last hope in Hoffa case," plaintiff was referred to as "a longtime underworld figure . . . (and) among those scheduled to meet Hoffa July

30." A September 9th article on the Hoffa case called plaintiff an "underworld figure." The September 16 article concerning the liquor license proceedings stated that plaintiff "has been named a key figure in the investigation into the disappearance of former Teamsters Union President James R. Hoffa." The complaint charged that all of the statements were "untrue, malicious and libelous."

The defendants filed separate answers in which both denied that the statements and characterizations were untrue or were published with malice. Both defendants also relied on a privilege established by Michigan common law to comment on matters of general public interest and on their rights under the First Amendment to the Constitution of the United States. In this regard they asserted that the plaintiff was a "public figure," at least for the purposes of this case.

Both defendants also filed motions for summary judgment supported by affidavits and exhibits. Nearly three years of intensive discovery by all parties preceded the motions for summary judgment. The deposition of the plaintiff Schultz was begun on May 17, 1977 and continued through a number of sessions until it was completed on May 24, 1979. This deposition extends to nearly 800 pages. The reporters who wrote the articles for *Newsweek* and *The Detroit News* gave their depositions as well. In addition, interrogatories were served and answered by all parties.

In its motion for summary judgment the defendant Newsweek relied on the privilege of fair comment on matters of public interest afforded by Michigan law and on its lack of actual malice as defined in cases under the Constitution as bases for its contention that the plaintiff had failed to show the existence of any genuine issue as to a material fact. Supporting affidavits of the *Newsweek* correspondent who filed the copy used in the August 18th article and of the editor who approved the article accompanied the motion. In these affidavits the

\* The Honorable George W. White, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

reporter and editor stated that they believed the statements were true and that they had never had any reason to doubt their truthfulness. The motion of the Evening News was based on the same legal premises as that of Newsweek. In an accompanying brief the Evening News referred extensively to discovery materials in support of its contention that the plaintiff had failed to demonstrate the existence of genuine issues of material fact. The plaintiff filed a response to the motions accompanied by his affidavit in which Schultz denied that he was an underworld figure or that he had any business involvement with members of the underworld or organized crime.

## B.

The district court filed an opinion and order granting summary judgment. *Schultz v. Newsweek, Inc.*, 481 F.Supp. 881 (E.D.Mich.1979). The decision was reached on the basis of the Michigan rule of qualified privilege, and the district court did not reach the question of whether the publications were privileged under the Constitution. The district court stated the Michigan rule of qualified privilege as follows:

> Under Michigan law, there is a qualified privilege to publish information which is in the public interest, which imposes a burden on plaintiff of proving defendants acted with actual malice. *See Orr v. Argus-Press Co.*, 586 F.2d 1108, 1113 (6th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773; *Schultz, supra*, 468 F.Supp. [551] at 562; *Lawrence, supra*, 357 Mich. [134] at 143, 97 N.W.2d 719; *Peisner v. Detroit Free Press, Inc.*, 82 Mich.App. 153, 163, 266 N.W.2d 693 (1978). The publisher of such information has this privilege whether or not the plaintiff is a public official. *See Schultz, supra*, 468 F.Supp. at 560–62; *Peisner, supra*, 82 Mich.App. at 161, 266 N.W.2d 693. Whether or not a communication is privileged is for the court to decide. *See Nuyen, supra*, 372 Mich. [654] at 659, 127 N.W.2d 369; *Lawrence, supra*, 357 Mich. at 139, 97 N.W.2d 719.

*Id.* at 884. While noting that the standard of malice to be applied to the Michigan qualified privilege is not totally clear, the district court concluded that "under Michigan's common law plaintiff must establish a disputed issue of fact that the defendants had actual malice as defined by *New York Times* [*New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 686 (1964)]—i.e., that defendants had knowledge of the falsity of their statements or acted in reckless disregard to the truth or falsity of their statements." 481 F.Supp. at 885.

The court then proceeded to analyze the evidence with respect to the article in *Newsweek*. This evidence established that the reporter had characterized the plaintiff as an underworld figure in reliance upon information from reputable sources, that information from the various sources relied upon was consistent and there was no reason for the reporter to doubt its veracity. These sources included discussions with FBI personnel and local and Michigan State Police, other reporters, the *New York Times* and Detroit dailies. In addition, the reporter had seen the plaintiff's police record, or "rap sheet" which showed four felony convictions between 1944 and 1960. The court also determined that the information relied upon fit the reporter's own definition of "underworld figure" as "someone who has had more than an occasional brush with the forces of law and order," and that there was no evidence that the reporter had reason to believe this definition was false. The court noted that the reporter's copy was checked for accuracy prior to publication of the article. From its review of the entire record the district court came to the following conclusion:

> Plaintiff has not pointed to any evidence which would create an issue of fact as to whether or not Newsweek's employees believed their characterization of plaintiff was false, or whether or not they acted recklessly in regard to the truth or falsity of their statement. Thus, there is no evidence of malice on the part of Newsweek.

*Id.* (footnote omitted).

A similar analysis was undertaken with respect to the claims against the defendant

Evening News. The court reviewed the evidence from which the reporters had determined that the plaintiff's name was being linked by law enforcement officers with the disappearance of Hoffa. The court held that the public has an interest in knowing details of a police investigation and that there was no evidence that anyone connected with the published articles believed the information concerning police interest in the plaintiff to be false or that it was published in reckless disregard for its truthfulness. The evidence further established that the reporters who referred to plaintiff as an underworld figure knew of his criminal record and of his continued association with persons publicly identified as underworld figures. The court also noted that one reporter testified that he had seen the plaintiff with a reputed leader of organized crime in Detroit, Anthony Giacalone, one of the other two people Hoffa was supposed to have met on the day of his disappearance. This reporter testified that he overheard Giacalone ask plaintiff whether he was "going to take the Fifth on the finances," and plaintiff did subsequently invoke the Fifth Amendment in refusing to answer questions before a federal grand jury investigating Hoffa's disappearance.

The court also found that the reporters' characterization of plaintiff was consistent with their definitions of "underworld figure": reporter Wendland, "someone with a long history of criminal convictions and associations"; reporter Nehman, "someone who has ties to the underworld in connection with a criminal past himself and an ongoing association or closeness or contact with those who likewise have criminal records or who may be engaged in unlawful activities." There was no showing that the reporters should have known these definitions were faulty or that their characterization of the plaintiff was false.

The court then stated its holding:

Plaintiff has not shown that either defendant published the allegedly defamatory statements with actual malice. Since the statements are protected under Michigan law by a qualified privilege un-

less published with actual malice, plaintiff has failed to show a material issue of fact is in dispute.[5] Therefore, this court must grant both defendants' motions for summary judgment.

[5] The defendants' articles are protected by the qualified privilege under Michigan law. Since the articles are so protected, this court need not decide whether plaintiff is a public figure such that these articles would be protected under federal constitutional law or whether the allegedly libelous statements are in fact true.

*Id.* at 888.

## II.

The plaintiff seeks reversal on a number of related grounds. Schultz admits his past criminal record, emphasizing, however, that he had no such record after 1960. He also admits his friendship with Anthony Giacalone, but points out that there was no showing of any business associations with Giacalone. He states that he has publicly denied being involved with organized crime or the underworld, that he had not planned to meet Jimmy Hoffa on July 30th and was in no way involved with his disappearance.

### A.

Schultz admits that Hoffa's disappearance was a subject of public interest and that the "focus" of each of the articles was cloaked with a qualified privilege under Michigan law. However, he contends that the district court erred as a matter of law in concluding that the qualified privilege shielded the defendants from the plaintiff's claims. This is because the court failed to establish the "scope" of the privilege. Arguing that he was an "incidental figure" in articles concerning Hoffa's disappearance, Schultz asserts that the court should have determined that references to him were outside the protection of the privilege. The court could properly determine that the general subject matter of the articles was within the zone of privilege; but the scope of the privilege was a jury question, according to the plaintiff.

Schultz also maintains that a jury question was presented as to whether the quali-

916

fied privilege was lost by abuse. The thrust of this argument is that the Michigan privilege is lost if a defamation is uttered with malice and that the existence of malice is a question of fact. The plaintiff contends that the district court erred in accepting the reporters' various definitions of "underworld figure" and that inconsistencies between these definitions and actual knowledge in the possession of the reporters created at least an inference of malice.

The plaintiff further argues that the district court applied the wrong standards in considering the defendants' motions for summary judgment. He relies on a "new wave" of judicial policy in defamation actions which disfavors summary judgment, and asserts that the district court's decision is out of step. Schultz also contends that Michigan law controls on the question of whether his evidence was sufficient to demonstrate the existence of a genuine issue of fact on the question of malice. Determination of malice involves credibility of the reporters and this issue is always for a jury, according to the plaintiff.

## B.

The defendants maintain that the entire report contained in each article was privileged and that there is no issue of "scope" since Schultz was not a "peripheral" or "incidental" figure. He was one of the three persons named by witnesses as part of a group Hoffa was planning to meet on the day of his disappearance. He was questioned repeatedly by law enforcement officials and was called to testify before a special grand jury investigating the Hoffa case. The Evening News asserts that the plaintiff was also a central figure in the proceedings where his sons sought a liquor license for their club. The only objection raised to granting the license was that the plaintiff had an undisclosed interest in the club and was not eligible for a license because of his criminal record and associations. Furthermore, the defendants argue, there is no support for the plaintiff's contention that the "focus" of the privilege is one of law while the "scope" is one of fact for the jury.

Both defendants contend that once a communication has been found entitled to the Michigan qualified privilege of fair comment the only remaining issue is whether the privilege has been destroyed by abuse. The test is the federal constitutional standard of "actual malice"—either that the material was known to be false or was published with reckless disregard of whether it was true or false. On this issue the plaintiff has the burden of proof. The nature of the claimed defamation has no effect on this burden, the defendants argue; malice may not be inferred from the words themselves. Rather, they state, "a high degree of awareness of probable falsity" must be shown by the plaintiff for a court to find that the privilege has been lost.

The defendants disagree with the plaintiff's views concerning the district court's treatment of their motions for summary judgment. The Michigan rule on the question of evidence required to defeat a motion for summary judgment has no application. They argue that the standards for summary judgment are contained in Rule 56, Fed.R. Civ.P., and apply to all actions in federal courts. They further contend that case law required the plaintiff to show the existence of a genuine issue on malice with "convincing clarity."

## III.

We address the issues raised under Michigan law first and will reach the constitutional issues in the case only if required to do so. In following this procedure, we recognize that state laws relating to defamation have been necessarily affected by First Amendment principles and in some respects have been "subsumed in" constitutional holdings. *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1114 (6th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). However, the nature of the publications involved in the present case and the way in which the issues have been presented appear to make it possible to reach a decision on the basis of Michigan law.

### A.

Since the parties disagree as to the proper standards for ruling on a motion for summary judgment, we will address this issue first. The language of Rule 56(c), Fed.R.Civ.P., provides an explicit standard: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The plaintiff insists that the district court ignored a "new wave" of federal precedent which favors denying summary judgment in defamation cases. The language relied upon is found in a footnote in *Hutchinson v. Proxmire*, 443 U.S. 111, 120, 99 S.Ct. 2675, 2680, 61 L.Ed.2d 411 (1979), where the Supreme Court noted that the district court in the case on review had said that summary judgment might well be the rule rather than the exception in determining whether an adequate showing of "actual malice" had been made in a defamation case. The Court then commented on the "so-called 'rule'" as follows:

> Considering the nuances of the issues raised here, we are constrained to express some doubt about the so-called "rule." The proof of "actual malice" calls a defendant's state of mind into question, *New York Times Co. v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), and does not readily lend itself to summary disposition. See 10 C. Wright & A. Miller, Federal Practice and Procedure § 2730, pp. 590–592 (1973). Cf. *Herbert v. Lando*, 441 U.S. 153 [99 S.Ct. 1635, 60. L.Ed.2d 115] (1979). In the present posture of the case, however, the propriety of dealing with such complex issues by summary judgment is not before us.

*Id.* n. 9, 99 S.Ct. at 2680 n. 9. See also *Wolston v. Reader's Digest Assn., Inc.*, 443 U.S. 157, 161 n. 3, 99 S.Ct. 2701, 2704 n. 3, 61 L.Ed.2d 450 (1979). We agree with the conclusion of the Second Circuit that there is no rule which favors either granting or denying motions for summary judgment in defamation cases. See *Yiamouyiannis v.*

*Consumers Union*, 619 F.2d 932 (2d Cir.), cert. denied, 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed. 46 (1980).

There is nothing in the record which indicates that the district court treated summary judgment as the rule rather than the exception in the present case. The court merely held the plaintiff had failed to meet the requirement of Rule 56(e), Fed.R.Civ.P.:

> ... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

The plaintiff argues that Michigan has a rule which defines the sufficiency of evidence required to defeat a summary judgment motion and that his evidence reached that level. He cites statements in cases from this court to the effect that state law on sufficiency of the evidence is controlling in diversity cases. See *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir. 1975); *Chumbler v. McClure*, 505 F.2d 489, 491 (6th Cir. 1974); *Moskowitz v. Peariso*, 458 F.2d 240, 244 (6th Cir. 1972). Each of these decisions concerned motions for directed verdict or for judgment n.o.v.; none involved summary judgment. No case has been cited or discovered where summary judgment in a federal court was denied because the opposing party satisfied a state rule on sufficiency of the evidence. Summary judgment practice in federal district courts is controlled by Rule 56, unaffected by state procedural rules.

### B.

The nature of the Michigan defense of privilege in defamation cases was discussed at length in *Lawrence v. Fox*, 357 Mich. 134, 97 N.W.2d 719 (1959). The qualified privilege to speak or publish words which are "in and of themselves" defamato-

ry depends upon external circumstances, or the "occasion" of their utterance or publication. *Id.* at 139–40, 97 N.W.2d 719. The court must decide as a matter of law whether there is a recognized public or private interest which would justify the utterance or publication. The privilege attaches to reports on matters of general public interest even though the plaintiff is a private individual. *Bortell v. Citizens for Better Care,* —— Mich.App. —— (6 Med.L.Rptr. 1797 (1980)); *Peisner v. Detroit Free Press, Inc.,* 82 Mich.App. 153, 266 N.W.2d 693 (1978); *Schultz v. Reader's Digest Assn.,* 468 F.Supp. 551, 561 (E.D.Mich.1979). We find no support for the plaintiff's contention that the "scope" of the privilege in cases involving matters of general public interest is a question of fact. *Bowerman v. Detroit Free Press,* 287 Mich. 443, 283 N.W. 642 (1939), was cited by plaintiff. However, the court in *Bowerman* decided the "scope" of the claimed privilege as a matter of law and noted that the case was not one involving a matter of public interest. *Id.* at 447, 283 N.W. 642.

 The privilege of fair comment is not absolute, but may be lost by abuse. It is lost if the utterance or publication is made with actual malice. *Lawrence v. Fox, supra,* 357 Mich. at 141, 97 N.W.2d 719. Though "actual malice" was equated with bad faith, ill will and personal hostility at one time, more recent Michigan decisions have indicated clearly that the definition of *New York Times* has been adopted. Compare *Lawrence v. Fox, supra,* 357 Mich. at 141, 97 N.W.2d 719 with *Arber v. Stahlin,* 382 Mich. 300, 308, 170 N.W.2d 45 (1969), *cert. denied,* 397 U.S. 924, 90 S.Ct. 927, 25 L.Ed.2d 103 (1970), and *Peisner v. Detroit Free Press,* 104 Mich.App. 59, 64, 304 N.W.2d 814 (1981). Thus the district court properly based its decision only on evidence which would support a claim that the defendants acted with knowledge that the statements objected to were false or with reckless disregard of whether they were false or not.

 The Supreme Court did not define "reckless disregard" in the *New York Times*

opinion. However, the meaning of this term was discussed in *St. Amant v. Thompson,* 390 U.S. 727, 730–31, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). After a review of intervening decisions, the court concluded:

> These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

390 U.S. at 731, 88 S.Ct. at 1325. Thus, unless there is a showing of actual doubt concerning the truth of the statements, mere evidence of incomplete investigation is insufficient to raise an inference of actual malice. *Schultz v. Reader's Digest Assn., supra,* 468 F.Supp. at 564.

### C.

 The district court did not err in granting summary judgment in favor of both defendants. In nearly three years of discovery the plaintiff failed to produce evidence of a single fact which demonstrated the existence of a genuine issue with respect to actual malice. We agree with the plaintiff that the issue of malice is a jury question and that malice can be established by inferences as well as by direct proof. See *Steadman v. Lapensohn,* 408 Mich. 50, 55, 288 N.W.2d 580 (1980). Nevertheless, the function of summary judgment is to dispose of cases without trial when one party is unable to demonstrate the existence of a factual dispute which, if present, would require resolution by a jury or other trier of fact.

 In essence the plaintiff argues that his evidence cast doubt on the sincerity of the claim of defendants' employees that they believed the offending statements were true. He refers to the fact that the reporters were unable to identify the individual police officer who furnished each

item of information about the plaintiff, and that the *Newsweek* correspondent criticized some of the media coverage of the Hoffa case in interoffice communications, but later testified that he relied on articles of various publications in concluding that it would be a truthful characterization of Schultz to describe him as an underworld figure. The plaintiff also contends that reliance by the district court on the reporters' definitions of "underworld figure" was error. None of these arguments is persuasive. The reporters identified reputable sources of their information, and when compared with such information and with other facts known to the authors, the statements in the various articles were not "inherently improbable." *Schultz v. Reader's Digest Assn., supra,* 468 F.Supp. at 565.

The articles which identified the plaintiff as a "key figure" in the Hoffa investigation or otherwise referred to him in that connection were based on information from several official sources. It was corroborated to the Evening News by one of the persons who conducted an interview with the witness who, under hypnosis, named Schultz as one of the persons whom Jimmy Hoffa planned to meet on July 30, 1975. There was no reason for anyone to doubt the accuracy of the statements and no evidence that they were published with any substantial doubt about their truth. The characterization of the plaintiff as an underworld figure in the various articles was also based on solid information. The authors of every piece which so described Schultz knew of his past criminal record. Several of them had seen a "rap sheet" which listed four felony convictions. Furthermore, despite the fact that his last conviction was 15 years old, the reporters were familiar with the undenied fact that the plaintiff continued to have a close relationship with at least one reputed major underworld figure at the very time the articles appeared. In addition, at least two of the reporters knew that Schultz had been questioned and his home had been searched in connection with the official investigation into the gang-style murder of one of his clients in 1974. Regardless of whether any of the reporters'

definitions of "underworld figure" were precisely correct, there was ample information to support their conclusion that this characterization could be applied accurately to the plaintiff. None of the plaintiff's "facts" or reasonable inferences arising therefrom, even if true, demonstrated any substantial doubt as to accuracy or any awareness of falsity on the part of either defendant. Thus, the plaintiff failed to demonstrate the existence of a genuine issue on the determinative question of actual malice. Under the circumstances the defendants were entitled to judgment as a matter of law, and summary judgment was proper. Rule 56(e), Fed.R.Civ.P.; *Ott v. Midland-Ross Corp.,* 600 F.2d 24, 28 n. 3 (6th Cir. 1979).

### IV.

While this case was pending in the district court the trial judge, the Honorable Cornelia Kennedy, was nominated to fill a newly-created position on this court. The *Detroit News* supported the appointment of Judge Kennedy in editorials and in at least one signed column. The plaintiff filed a motion requesting Judge Kennedy to recuse herself in this case. The motion was made while the case was pending on the defendants' motions for summary judgment. Although the motion cited two recusal statutes, 28 U.S.C. § 144 and 28 U.S.C. § 455(a), on appeal from denial of the motion, the plaintiff relies only on § 455(a) which provides:

> (a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

In denying the motion Judge Kennedy stated that a reasonable person would not believe that a judge would be influenced in favor of a newspaper because it wrote complimentary things about her. One of the functions of a newspaper is to comment on matters such as appointments to public office. A newspaper should not feel any hesitation about commenting, either for or against, a judicial appointment based on the effect such comment might have on litigation in which it is interested.

Applying the objective standard of § 455(a) we find no abuse of discretion in the district Judge's denial of the recusal motion. The cases relied upon by the plaintiff are distinguishable.

The judgment of the district court is affirmed.