Craig **WRUBEL**, Individually; Brenda Wrubel, Individually, and as Next Friend of Plaintiff, Ryan Wrubel, a Minor, Plaintiffs,

v.

Michael **BOUCHARD**, Individually, and in his representative capacity as the Oakland County Sheriff; Sergeant Jane Boudreau, Individually and in her representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; Sergeant Gary Miller, Individually, and in his representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; Lieutenant Joseph Quisenberry, Individually, and in his repre-

sentative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; and Sergeant William Harvey, Individually, and in his representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; Defendants.

No. 00–73899.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 21, 2001.

Thomas W. Jakuc, Warren, MI, for Plaintiff Counsel.

Steven M. Potter, Rick J. Patterson, Potter, Carniak, Anderson & DeAgostino, Auburn Hills, MI, for Defendants' Counsel.

---

**OPINION AND ORDER**

FEIKENS, District Judge.

## I. INTRODUCTION

Plaintiffs Craig, Ryan and Brenda Wrubel sue defendants for claims arising out of the wrongful arrest of Craig Wrubel (Wrubel) for a rape that was committed on September 6, 1999. Wrubel claims that he was arrested without a warrant and without probable cause and therefore defendants Bouchard, Boudreau, Harvey and Miller violated his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. He also alleges state claims of false arrest and false imprisonment (against defendants Boudreau, Harvey and Miller), defamation (against defendants Quisenberry and Bouchard only), and intentional infliction of emotional distress (against defendants Boudreau and Harvey only). The three plaintiffs allege claims of intentional infliction of emotional distress and Brenda Wrubel alleges a claim of loss of consortium.

Defendants filed a motion for summary judgment on all counts.[1] They contend that no constitutional violation was committed or, in the alternative, they are entitled to qualified immunity. I heard oral argument on this motion on July 30, 2001 and I ordered the parties to file supplemental briefs on the issue of probable cause.

## II. BACKGROUND

On September 6, 1999 Wrubel and his 9 year old son Ryan played golf at the Twin Lakes Golf Course in Oakland County. They teed off around 4:30 p.m. When he signed in, Wrubel listed his name as "Ru-

---

1. Defendants County of Oakland, Oakland County Sheriff's Department, Stephen Clark and Terry Cashman were dismissed by stipulated order on July 24, 2001. Defendants Twin Lakes Golf Course and Jane Doe were dismissed by stipulated order on March 16, 2001. The caption was amended by stipulated order on July 24, 2001.

bel." The golf course's employee Nicole Picklo (Picklo), who was 15 years old at the time, handled the transaction.

Wrubel and his son had played seven holes and hit their tee shots on the eighth hole before it began to rain heavily. They sought cover beneath an awning in front of the Turn Grill, a concession stand adjacent to the ninth green. There were approximately four other men who sought shelter with them. Though the rain began to let up, Jared Zalewski (Zalewski), assistant golf pro and manager of the pro shop, informed the men, including Wrubel and his son, that the storm had stalled over the golf course and therefore they had to leave. When asked by Wrubel, Zalewski advised him as to the procedure for securing a raincheck. Wrubel and his son got back into their golf cart and returned to the clubhouse.

Wrubel and his son spent time wandering around the clubhouse prior to obtaining the raincheck. They watched the television monitor which was broadcasting the weather radar. They looked at money frames hung on the wall in the clubhouse. Then, they got in line to get the raincheck. Picklo again handled the transaction. Wrubel corrected the spelling of his name, explaining that he usually spells it without the "W" because people get confused and find it hard to pronounce. The raincheck was time-stamped at 6:47 p.m. Wrubel and his son left the pro shop, collected their clubs from their golf cart and headed to Wrubel's truck. Wrubel stowed the clubs in his truck and changed into his street shoes.

Meanwhile, inside the clubhouse, at 6:55 p.m., Picklo received a call from Kelly Bardelline (Bardelline), an employee of the golf course who worked at the Turn Grill. Bardelline told Picklo that she had been raped and asked for help. Picklo immediately told her manager, Zalewski, who was

in the pro shop with her. He instructed Picklo to call 911. Picklo called 911 while Zalewski and two other employees raced off in two vehicles to Bardelline's aid.

Wrubel and his son saw the two vehicles race out of the parking lot. Sensing something was amiss, they decided to follow. Moments later, a jeep driven by another golf course employee rapidly pulled behind them. Wrubel pulled off the road to let him pass. Shortly thereafter, however, the Wrubels lost interest in the chase and went home.

Picklo's call to 911 was logged at 6:55 p.m. Oakland County Deputy Sheriff Sherry Locher (Locher) was dispatched to the scene at 7:01 p.m. and arrived at the scene at 7:11 p.m. Bardelline told Locher that earlier in the afternoon the rapist had come by the Grill to ask how to get to the clubhouse. She told Locher that at the same time there were about six men in the area of the Grill but that Bardelline did not feel that the rapist was a part of this group. She told Locher that the six men were asked to clear the course by one of the golf course employees. About ten minutes later the rapist returned, entered the Grill through the back door and raped her. She described him to Locher as dark complected, possibly Chaldean, with no facial hair but a scruffy look, wearing a red and blue (or black) striped shirt and dark shorts.

The police also questioned Picklo, the cashier. She told them that she remembered one of the golfers who fit Bardelline's description of the rapist. She then described Wrubel noting his distinctive facial features which include: a surgical scar on his cheek, pockmarks on his cheeks, a mustache and beard, missing lower front teeth and a darkened front tooth. She also told them that he was with a young boy whom he left alone in the pro shop after he got his raincheck. Another em-

ployee told them that Wrubel was seen driving out of the golf course at a high rate of speed after the rape.

Deputy Locher took Bardelline to the hospital where they met with Sergeant Jane Boudreau (Boudreau). A rape kit was done. Bardelline gave the same description to Boudreau that she had given to Locher. She did not mention any of Wrubel's distinctive facial features.

The following day, Tuesday, September 7, 1999, both Bardelline and Picklo made composites at the police station. Bardelline's composite was drawn by a computer with the aid of Deputy Robert Charlton. Picklo's composite, which was far more detailed, was drawn by police artist Barbara Martin. The composites bore few, if any, similarities to each other. Picklo's composite, however, strongly resembled Wrubel. The police chose this composite to distribute to local news agencies, along with his name (spelled "Rubel"), that he was with a small child, and drove a truck.

Late on the evening of September 7, 1999, Wrubel returned home after playing in his Tuesday night golf league. His wife Brenda was distraught. She told him that he was a suspect in a rape. They watched the story about the rape, which featured Picklo's composite, on the 11 o'clock news. He told her not to worry, that they would go down to the police station and clear everything up. They went to the Oakland County Sheriff's Department at approximately 11:45 that night and brought Ryan along.

That night, after they arrived at the station, the police questioned Wrubel about the rape. They told him they knew he did it, that the victim described him exactly. They accused him of lying. Wrubel gave them the raincheck, time-stamped at 6:47 p.m. The police kept the raincheck as evidence.

The police also questioned Ryan that night (after receiving his mother's permission). He told the police what happened the day of the rape including the storm, the raincheck and the car chase. After a while the police stopped questioning him and allowed him to wait with his mother. However, after conferring, they took him back in for more questioning. They told him that he and his father were bad liars. They told him that his father admitted that he had left Ryan alone and that when they went to retrieve the golf clubs their cart had been moved. Ryan then equivocated and stated that perhaps if his dad left him it was only to smoke a cigarette and that maybe the cart had been moved. In his deposition testimony Ryan testified that he had only agreed because the police told them his father had said so. He also later remembered that another cart had been moved, not theirs.

The police took Wrubel to booking and arrested him at 3:25 a.m. on September 8, 1999. They gave him a blanket and placed him in the shower at the station to sleep. Around 8:00 a.m. the police moved him into his own cell.

The police continued to question Wrubel on September 8, 1999. At approximately 2:00 p.m. he was taken to a line-up. Bardelline, the victim, failed to identify him as her attacker. However, the police continued to keep him in custody.

On Thursday, September 9, 1999, the police secured a search warrant for a DNA sample from Wrubel. They took samples of his hair and blood. Wrubel was finally released at noon on September 9, 1999. The DNA test ultimately excluded Wrubel as the "donor." No one notified Wrubel of this result. Moreover, the police refused to concede that Wrubel was no longer a suspect. No charges were brought against him.

## III. DISCUSSION

### A. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be granted under Rule 56 of the Federal Rules of Civil Procedure if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a· matter of law." F.R.C.P. 56(c). In ruling on this motion, inferences must be viewed in light most favorable to the nonmoving party. *See Matsushita Electrical Industry Company,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. CONSTITUTIONAL VIOLATIONS

In count I, Wrubel alleges that defendants Bouchard, Boudreau, Harvey and Miller violated his constitutional rights by arresting him without probable cause. Only Boudreau, Harvey and Miller participated in Wrubel's arrest. Summary judgment is denied to these defendants. However, as Bouchard played no role in the violation of Wrubel's constitutional rights, summary judgment is granted for him as to count I.

#### 1. *PROBABLE CAUSE*

■ The first issue is whether probable cause existed for Wrubel's arrest at the time of his arrest. If probable cause existed, there is no constitutional violation and hence all claims must fail. However, based upon the undisputed facts, probable cause did not exist at the time of Wrubel's arrest.

Wrubel was arrested without a warrant after being questioned at the police station. Probable cause exists if "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). The crucial period for this determination is *at the time of the arrest.* Additional information that comes to light later is irrelevant in this determination.

The police were aware of three significant pieces of information which clearly showed an absence of probable cause at the time of Wrubel's arrest: (1) there was, at most, an eight minute window during which Wrubel could have committed the rape and he was a three to five minute distance from where the rape occurred, (2) the victim had excluded as possible suspects a group of golfers who had sought shelter near the Turn Grill among whom were Wrubel and his son, (3) the victim mentioned none of Wrubel's distinctive facial characteristics. Moreover, Wrubel posed no flight risk, had turned himself in, and was fully cooperative with the police allowing even his son to be interviewed.

##### a. Time Frame

At the time the defendants arrested Wrubel they knew that the call to 911 was made at 6:55 p.m. They knew that Wrubel received his raincheck at 6:47 p.m. They knew that it was a three to five minute drive by golf cart from the clubhouse where Wrubel got the raincheck to the Grill where the rape was committed. *See* Defendants' Reply Brief, at 5 ("[T]he ride to the turn grill via golf cart from the pro shop is only a three ·to five minute ride . . . ."). They also had been told that Wrubel left his son alone *after* receiving his raincheck. This left him, as far as the police knew at the time, only eight minutes to commit the rape. Given the distance

between the Grill and the clubhouse, this would be nearly impossible.

Defendants argue that the clock that stamps the rainchecks is not synchronized with the time on the phones. However, defendants were not aware of this discrepancy at the time they arrested the plaintiff and therefore this alleged discrepancy is irrelevant. The defendants would have me believe that the only relevant issue is how much time actually transpired between the time Wrubel received his raincheck and the time that the victim called to report the rape. This is incorrect. The police knew at the time of his arrest, Wrubel would have had only eight minutes. This is the only relevant time frame.

Moreover, the police failed to consider that Wrubel was at the clubhouse, in the parking lot, when Bardelline's call came in. He saw Zalewski and the others race off to her aid, and followed them. He could not have been in two places at one time. If he were the rapist, he had eight minutes to make a round trip between the clubhouse to the grill, a journey that would take six to ten minutes, and be back at the clubhouse by the time the call came in. This further establishes the sheer improbability that Wrubel could have committed the rape.

#### b. The Victim's Description

As is evident from Picklo's description, Wrubel has distinctive facial features, including a surgical scar on his cheek, pockmarks on his cheeks, a mustache and beard, missing lower front teeth and a darkened front tooth. Yet, when Bardelline described her attacker first to Locher, then to Boudreau and finally to the officer who generated a computer composite, she did not mention a single one of these characteristics. In fact, the two composites bore few if any similarities. Picklo was only 15 years old and this should have

been taken into account. Wrubel's face stood out to her only because he has a distinctive, recognizable face.

#### c. The Men Outside the Turn Grill

At the time of Wrubel's arrest, the officers knew that Wrubel had sought shelter outside the Turn Grill before returning to the clubhouse. They also knew that approximately four other men also sought shelter there. They knew that the rapist was not one of these men. The victim herself had ruled them out when she told Locher that the rapist had first appeared at the same time as these men, yet was not part of this group. This should have excluded Wrubel as the rapist as well.

Given the totality and reliability of the facts known to the arresting officers at the time of the arrest, there was no probable cause to arrest Wrubel without a warrant. Therefore, defendants violated Wrubel's constitutional rights.

#### 2. *QUALIFIED IMMUNITY*

■ Defendants assert that they are entitled to qualified immunity. To determine whether qualified immunity exists I must engage in a three-part analysis. First, it must be established that there was a constitutional violation. As discussed above, there was no probable cause for Wrubel's arrest: therefore, a constitutional violation exists.

Next, it must be determined whether the right that was violated was clearly established at the time it was violated. *See Gardenhire v. Schubert*, 205 F.3d 303, 311 (2000). The Fourth Amendment protects citizens from unreasonable searches and seizures. It has long been established that to arrest an individual without a warrant absent probable cause is a violation of the Fourth Amendment. *See id.* at 312–13.

Even though the right is clearly established, defendants are still entitled to qualified immunity but only if their actions were reasonable. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987). The Sixth Circuit has noted that "[q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Rippy, et al. v. Hattaway, et al.,* No. 99–6277, slip op. at 12 (6th Cir.2001) *citing Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Given the undisputed facts of this case I must conclude that this was a clearly bungled investigation in which the defendants erroneously and unreasonably focused their efforts on the wrong man. The fact that Wrubel would have had only eight minutes in which to commit the rape is alone enough to show that defendants' belief that there was probable cause was unreasonable. There was no probable cause to arrest Wrubel and I conclude that no reasonable officer would believe that there was probable cause for an arrest.

Thus, there is (1) a constitutional violation (2) of a clearly established right and (3) the actions of the defendants were not reasonable. Defendants are not entitled to qualified immunity. Thus, summary judgment is denied defendants Boudreau, Harvey and Miller as to count I.

### 3. *SHERIFF BOUCHARD*

There is no evidence that Sheriff Bouchard in any way participated in the investigation or arrest of the plaintiff. He cannot be held liable under a theory of respondeat superior. *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Therefore, summary judgment is granted to defendant Bouchard as to this count.

### C. STATE LAW CLAIMS

### 1. *FALSE ARREST AND FALSE IMPRISONMENT*

■ In counts II and III of his complaint, Wrubel alleges state law claims of false arrest and false imprisonment against defendants Boudreau, Harvey and Miller. "In order to prevail on a claim of false arrest or false imprisonment, the plaintiff must show that the arrest was not legal, i.e., that it was made without probable cause." *Tope v. Howe,* 179 Mich.App. 91, 445 N.W.2d 452, 459 (1989). As discussed above, there was no probable cause for plaintiff's arrest. Therefore, summary judgment is denied as to Counts II and III.

### 2. *DEFAMATION*

In count IV of his complaint, Wrubel alleges that defendants Quisenberry and Bouchard published false and defamatory statements about him in the media. He alleges that the defendants either knew the statements were false or had a reckless disregard for their veracity. He attaches three newspaper articles to his brief in opposition to defendants' motion. The first article was published in the Detroit Free Press (in at least two editions) under the title "Police seek suspect in sexual assault." The article begins by stating "Police are searching for a man who sexually assaulted a female concessionaire at an Oakland Township golf course on Labor Day". The article states that he identified himself as "Rubel", and described him as missing two lower teeth and having a swooping scar on his cheek. The article credits Bouchard as the provider of the information. In one edition, the article also includes the composite done by Picklo. The second article, published in the Detroit News, is titled "Charges near in golf rape." The article quotes Quisenberry as saying, "The drawing was right on the

money—right down to a scar on his cheek." He is also quoted as saying that Wrubel, whose name is not mentioned in the article "never denied he was at the golf course Monday when the assault happened." The article also says, erroneously, that it was the victim who provided "a good description of her attacker, whom she said was missing two lower teeth and had a scar resembling the Nike 'swoosh' logo on his right cheek." The third article also fails to identify Wrubel by name but does mention the detailed description which the newspaper erroneously credits to the victim. Quisenberry, noting that the police were awaiting the results of a physical evidence analysis, said, "He may be cleared or he may be focused upon. The test will tell us everything. Right now, we can confirm that we did have an interview with him and he was cooperative in the process."

■ The legal elements plaintiff must show to establish a claim of defamation are "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod)." *Ireland v. Edwards*, 230 Mich.App. 607, 614, 584 N.W.2d 632, 637 (1998). Under Michigan law, "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Rouch v. Enquirer & News of Battle Creek Michigan*, 440 Mich. 238, 250, 487 N.W.2d 205, 210 (1992) *quoting* 3 Restatement Torts, 2d, § 559, p. 156. In order for a statement to be actionable, it must be provable as false. *See Ireland*, 230

Mich.App. at 616, 584 N.W.2d 632 *citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). The above statements are defamatory because they would harm Wrubel's reputation. However, nearly all these statements are true and therefore not actionable. Only the statements reporting that the *victim* gave the police Wrubel's description are false and only these may be actionable.

■ Michigan law, however, also allows for a qualified privilege for communications made in the public interest. "The qualified privilege to speak or publish words which are 'in and of themselves' defamatory depends upon external circumstances, or the 'occasion' of the utterance of publication. The court must decide as a matter of law whether there is a recognized public or private interest which would justify the utterance or publication. The privilege attaches to reports on matters of general public interest even thought the plaintiff is a private individual." *Schultz v. Newsweek, Inc.* 668 F.2d 911, 917 (6th Cir.1982). The defendants' statements were in reference to a criminal investigation of a rape. This information is clearly a matter of legitimate public interest. These statements are defamatory and at least one of them is false. However, because they are a matter of legitimate public interest, they are entitled to a qualified privilege. Therefore, the plaintiff must show more than mere negligence to overcome the privilege. "[The privilege] is lost if the utterance or publication is made with actual malice." *Id.* Malice is defined as knowledge of falsity or a reckless disregard for the statement's veracity. "While the existence of malice is a question of fact, as with any issue otherwise requiring a jury's determination, the question of malice may become one of law if the defendant moves for summary judgment and

the plaintiff fails to establish the existence of a genuine issue as to any material fact." *Bichler v. Union Bank and Trust,* 745 F.2d 1006, 1013 (6th Cir.1984) citing *Schultz,* 668 F.2d at 918. Though plaintiff makes general allegations that defendants acted with malice, he has provided no supporting evidence to establish a genuine issue of material fact as to malice. Therefore, summary judgment must be granted to defendants Bouchard and Quisenberry as to count IV.

### 3. *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

 In counts V–VII, plaintiffs allege the intentional infliction of emotional distress (IIED) as to all three plaintiffs. Though the Michigan Supreme Court has not formally recognized the tort of IIED (*see Sudul v. City of Hamtramck,* 221 Mich.App. 455, 462, 562 N.W.2d 478, 481 (1997)), the Michigan Court of Appeals has established a standard for such claims. *See, e.g., Haverbush v. Powelson,* 217 Mich.App. 228, 551 N.W.2d 206 (1996). The plaintiffs must show the following four elements in order to establish a prima facie case: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *See Graham v. Ford,* 237 Mich.App. 670, 674, 604 N.W.2d 713 (1999). Plaintiffs' pleadings and submissions fail to establish any of these elements. The conduct which gave rise to this case, while incompetent and unprofessional, does not rise to the level of extreme and outrageous conduct. Therefore, summary judgment is granted to the defendants as to counts V–VII.

### 4. *LOSS OF CONSORTIUM*

In count VIII of the complaint, Brenda Wrubel alleges loss of consortium due to the injuries suffered by Craig Wrubel. Defendants make no argument for summary judgment on this count. Therefore, because a claim still exists for the violation of Wrubel's constitutional rights, summary judgment for the defendants is denied as to this count.

## IV. CONCLUSION

Defendants motion for summary judgment is granted to defendant Bouchard as to counts I and IV. Summary judgment is granted to defendant Quisenberry as to count IV. Summary Judgment is also granted to all defendants as to claims V–VII. However, summary judgment is denied to defendants Boudreau, Harvey and Miller as to counts I, II and III.

IT IS SO ORDERED.