Craig WRUBEL, Individually; Brenda Wrubel, Individually, and as Next Friend of Plaintiff, Ryan Wrubel, a Minor, Plaintiffs,

v.

Michael BOUCHARD, Individually, and in his representative capacity as the Oakland County Sheriff; Sergeant Jane Boudreau, Individually and in her representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; Sergeant Gary Miller, Individually, and in his representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; Lieutenant Joseph Quisenberry, Individually, and in his representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department; and Sergeant William Harvey, Individually, and in his representative capacity as a Deputy Sheriff for the Oakland County Sheriff's Department, Defendants.

No. 00–73899.

United States District Court,
E.D. Michigan,
Southern Division.

May 3, 2002.

Thomas W. Jakuc, Warren, for Plaintiff Counsel.

Steven M.. Potter, Potter, Carniak, Anderson & DeAgostino, Auburn Hills, for Defendant Counsel.

## *OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

FEIKENS, District Judge.

## I. INTRODUCTION

Plaintiffs Craig, Ryan and Brenda Wrubel sue defendants for claims arising out of the wrongful arrest of Craig Wrubel (Wrubel) for a rape that was committed on September 6, 1999. Wrubel claims that he was arrested without a warrant and without probable cause and therefore defendants Bouchard, Boudreau, Harvey and Miller violated his rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. He also alleges state claims of false arrest and false imprisonment (against defendants Boudreau, Harvey and Miller), defamation (against defendants Quisenberry and Bouchard only), and intentional infliction of emotional distress (against defendants Boudreau and Harvey only). The three plaintiffs allege claims of intentional infliction of

emotional distress and Brenda Wrubel alleges a claim of loss of consortium.[1]

After denying defendant's motion for summary judgment on the issue of probable cause and qualified immunity (*Wrubel v. Bouchard*, 173 F.Supp.2d 716 (E.D.Mich.2001)), I raised the issue of granting summary judgment *sua sponte* to weigh every fact that could create a jury issue and allow defendants to present their disputed issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte* so long as the losing party was on notice that she had to come forward with all of her evidence.")

In response, plaintiffs now move for a grant of summary judgment on the issue of probable cause. For the reasons below, I grant summary judgment for the plaintiffs because even when the evidence is viewed in a light most favorable to the defendants, defendants did not have probable cause to arrest plaintiff and are not qualifiedly immune.

## II. BACKGROUND

On September 6, 1999 Wrubel and his 9–year old son Ryan played golf at the Twin Lakes Golf Course in Oakland County. They teed off around 4:30 p.m. When he signed in, Wrubel listed his name as "Rubel." The golf course's employee Nicole Picklo (Picklo), who was 15 years old at the time, handled the transaction.

Wrubel and his son had played seven holes and hit their tee shots on the eighth hole before it began to rain heavily. They sought cover beneath an awning in front of the Turn Grill, a concession stand adjacent to the ninth green, and the place where the rape took place. There were approximately four other men who sought shelter with them. Though the rain began to let up, Jared Zalewski (Zalewski), assistant golf pro and manager of the clubhouse, informed the men, including Wrubel and his son, that the storm had stalled over the golf course and therefore they had to leave. Wrubel and his son got back into their golf cart and went back to the clubhouse to obtain a raincheck and complete their golf outing.

Wrubel and his son wandered about the clubhouse prior to obtaining the raincheck. They watched the television monitor which was broadcasting the weather radar. They looked at money frames hung on the wall in the clubhouse. Then, they got in line behind other golfers to get the raincheck. Picklo again handled the transaction. Wrubel corrected the spelling of his name, explaining that he usually spells it without the "W" because people get confused and find it hard to pronounce. *The raincheck was time-stamped at 6:47 p.m.* Wrubel and his son left the clubhouse, collected their clubs from their golf cart and headed to Wrubel's truck. He stowed the clubs in his truck and changed into his street shoes.

Meanwhile, inside the clubhouse, Picklo received a call from Kelly Bardelline (Bardelline), a new employee of the golf course who worked at the Turn Grill. Bardelline told Picklo that she had been raped and asked for help. Picklo immediately told her manager, Zalewski, who was in the clubhouse with her. He instructed Picklo to call 911. Picklo called 911, and this call was logged in at the Oakland County Sheriff's Department at 6:55p.m.[2]

---

**1.** Only counts of Deprivation of Constitutional Right, False Arrest, and False Imprisonment remain against defendants Boudreau, Harvey and Miller. The other charges were dismissed in the Opinion and Order dated November 21, 2001. *Wrubel v. Bouchard*, 173 F.Supp.2d 716 (E.D.Mich.2001).

**2.** Boudreau testified: "We got the call at 18:55 . . . ." (Dep. Boudreau Pl. ex. A at 27)

Zalewski and two other employees raced off in two vehicles to Bardelline's aid. Wrubel and his son, while in the clubhouse parking lot, saw the two vehicles race out of the parking lot. Sensing something was amiss, they decided to follow in his truck. Moments later, a jeep driven by another golf course employee rapidly pulled up behind them. Wrubel pulled off the road to let him pass and then discontinued the chase and went home.

Oakland County Deputy Sheriff Sherry Locher (Locher) was dispatched to the scene at 7:01 p.m. and arrived at the Turn Grill at 7:11 p.m. Visibly shaken, Bardelline told Locher that earlier in the afternoon the rapist had come by the Turn Grill to ask how to get to the clubhouse. At the same time there were about six men in the area of the Turn Grill, two of whom were Wrubel and his son, but that Bardelline did not feel that the rapist was a part of this group.[3] She told Locher that the six men were asked to clear the course by one of the golf course employees.

She described the rapist to Locher as dark complected, possibly Chaldean, with no facial hair but a scruffy look, wearing a red and blue or black striped shirt and dark shorts. She also told Locher that she did not get a good look at the rapist's face because she was afraid, and focused only on his eyes.

Officer Steven Clark (Clark) also questioned Picklo, the cashier. She told them that she remembered one of the golfers who fit Bardelline's description of the rapist. She then described Wrubel noting his distinctive facial features which include: a surgical scar on his cheek, pockmarks on his cheeks, a mustache and beard, missing lower front teeth and a darkened front tooth. She also told Clark that he was with a young boy whom he left

alone in the clubhouse *before* he got his raincheck. Subsequently, Picklo changed her testimony in a written statement to reflect that plaintiff had left the young boy *after* he got the raincheck. Another employee, Jason, told them that he saw Wrubel driving out of the golf course at a high rate of speed after the rape as he was returning from searching for the rapist and described Wrubel's red Ford F-250 pickup truck.

Deputy Locher took Bardelline to the hospital where they met with Sergeant Jane Boudreau (Boudreau). A rape kit was done. Bardelline gave the same description to Boudreau that she had given to Locher, but she did not mention any of Wrubel's distinctive facial features.

Bardelline also described the rape to Boudreau in greater detail. She said that the rapist returned about ten minutes after the group of men cleared the course, entered the Turn Grill through the back door and told her to be quiet, take off her clothes and lie on the floor. Bardelline was scared and followed his orders. The rapist then dropped his shorts, but his penis was not totally erect. He started fondling her breasts and inserting his penis into her vagina. The rapist then removed his penis and grabbed it with his hand to make it erect and inserted it again into her vagina. When he stood up to pull up his shorts, he commanded her not to move and left. Because she did not see which way he left, *Bardelline said she waited one or two minutes before crawling to the phone and calling the clubhouse for help.*

The following day, Tuesday, September 7, 1999, both Bardelline and Picklo made drawings at the police station. Bardelline's drawing was done by a computer

---

**3.** "She stated there were about six other guys hanging in the area of the halfway grill [when the rapist first approached the victim] but did not feel they were with the suspect" (Locher Narrative Police Report, Pl. ex. O)

with the aid of Deputy Robert Charlton, but Bardelline was not satisfied with the drawing. Picklo's drawing, which was far more detailed, was drawn by police artist Barbara Martin. The drawings bore few, if any, similarities to each other. Picklo's drawing, however, strongly resembled Wrubel. The sheriff's department chose this drawing to distribute to local news agencies, along with his name (spelled "Rubel"), that he was with a small child, and drove a truck.

Boudreau chose Picklo's drawing over Bardelline's because Bardelline said she did not get a good look at the rapist, and because she was afraid, she focused only on his eyes. On the other hand, Picklo's drawing was far more detailed and Picklo was more confident about her drawing.

Picklo's drawing of Wrubel was broadcast over the local TV news. Wrubel's sister noticed the drawing, called the sheriff's department, and spoke to Boudreau. She told Boudreau that the suspect was her brother and asked Boudreau what he should do.

Late on the evening of September 7, 1999, Wrubel returned home after playing in his Tuesday night golf league. His wife Brenda was distraught. She told him that he was a suspect in a rape. They watched the story about the rape, which featured Picklo's drawing, on the 11 o'clock news. He told her not to worry, that they would go down to the police station and clear his name. They went to the Oakland County Sheriff's Department at approximately 11:45 p.m. Ryan accompanied them.

When they arrived at the station, Boudreau, Sergeant William Harvey (Harvey), and Sergeant Gary Miller (Miller) questioned Wrubel about the rape. They told him they knew he did it, that the victim described him "to a tee." They accused him of lying. When Boudreau told him that the rape probably occurred between 6:30 p.m. and 6:50 p.m., Wrubel held out

his raincheck and exclaimed that he got the raincheck at 6:47 p.m. and then proceeded to unload the golf cart. Wrubel Interrogation Tape 1, 12:23a.m. However, Boudreau and Harvey did not take notice of the raincheck and no investigation was done on this vital piece of evidence.

Miller and Detective Don Corey (Corey) questioned Ryan that night (after receiving his mother's permission). Ryan told them what happened the day of the rape, including the storm, the raincheck and the car chase. They stopped questioning Ryan and allowed him to wait with his mother. However, after conferring, Miller and Corey took Ryan back in for more questioning. Miller told him that he and his father were bad liars. Miller told Ryan that his father admitted that he had left Ryan alone, and that when they went to retrieve the golf clubs their cart had been moved. Ryan then equivocated and stated that perhaps if his dad left him it was only to smoke a cigarette and that maybe the cart had been moved.

Harvey and Miller continued to interrogate Wrubel, telling him that Ryan had exposed him and insisted that Wrubel had left Ryan alone for about ten to fifteen minutes. Hoping to elicit a confession, they continued to interrogate him until three o'clock in the morning. All the while, Wrubel maintained his innocence and insisted that he never left Ryan alone and had never even seen Bardelline, let alone rape her.

Unable to secure a confession, Boudreau and Harvey took Wrubel to booking and arrested him at 3:25 a.m. on September 8, 1999, approximately thirty-six hours after the rape occurred. During this time, the sheriff's department never sought a warrant for Wrubel's arrest.

They gave Wrubel a blanket and placed him in the shower at the station to sleep and transferred him to a cell in the morn-

ing. The sheriff's department continued to question Wrubel on September 8, 1999. At approximately 2:00 p.m. he was taken to a line-up. Bardelline, the victim, did not identify him as her attacker. However, the sheriff's department continued to keep him in custody.

On Thursday, September 9, 1999, the sheriff's department secured a search warrant for a DNA sample from Wrubel. They took samples of his hair and blood. Wrubel was finally released at noon on September 9, 1999 pending further investigation. The DNA test results, which did not return until the following March,[4] excluded Wrubel as the "donor." No one notified Wrubel of this result. Moreover, the sheriff's department refused to concede that Wrubel was no longer a suspect. No charges were brought against him.

## III. ANALYSIS

### 1. *Summary Judgment Standard*

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). I must view the evidence and any inferences drawn from the evidence in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted), *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir.2001). But I reiterate, defendants had earlier contended that there were no questions of fact.

### 2. *Mixed Question of Law and Fact*

■ The question whether there is probable cause for an arrest is a mixed question of law and fact. *Ornelas v. United States*, 517 U.S. 690, 696–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Gardenhire v. Schubert*, 205 F.3d 303 at 312 (6th Cir. 2000). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* at 315. *See also S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 272 (4th Cir.1998) ("[w]hen ... there is no genuine issue of material fact, the existence of probable cause becomes a purely legal question subject to de novo review."); *Potts v. City of Lafayette*, 121 F.3d 1106, 1112 (7th Cir. 1997) (same). Therefore, if there is only one reasonable determination possible, I may rule on the issue of probable cause as a matter of law.[5]

### 3. *Probable Cause*

Probable cause exists when the police have "reasonably trustworthy information ... sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). "Probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge *at the time of an arrest.*" *Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir.2000) (emphasis added).

### A. *Time–Stamped Raincheck*

Viewing the totality of facts in a light most favorable to the defendants, I must determine whether a jury could conclude

---

**4.** Inexplicably, the time for obtaining the test results took over six months.

**5.** In any event, defendants previously argued in their motion for summary judgment that I

may decide the issue of probable cause as a matter of law. They are precluded from arguing now that I do not have the power to do so.

that the sheriff's department had reasonably trustworthy information at the time of the arrest that could lead an objective person to conclude that plaintiff had committed the rape. I conclude that a reasonable jury could not do so.

■ In a previous opinion and order which denied defendants' motion for summary judgment, I concluded that defendants had bungled their investigation. *Wrubel v. Bouchard,* 173 F.Supp.2d 716 (E.D.Mich.2001). They had more than 36 hours after the rape occurred to analyze the evidence. Although the sheriff's department might have had a reasonable suspicion based on the identification evidences they obtained,[6] the time-stamped raincheck is the uncontroverted physical evidence that destroyed defendants' belief that they had probable cause. When Wrubel came to the station house, he showed them the raincheck and that it was time-stamped at 6:47 p.m. In the initial interview, Boudreau told Wrubel that the rape probably occurred between 6:30 p.m. and 6:50 p.m. and that Wrubel had left the Turn Grill and came back to rape Bardelline. It was then that Wrubel held out his raincheck and pointed out that he got his raincheck at 6:47 p.m., which would preclude him from being the rapist.[7] This is vital to the analysis. At this point, Boudreau and Harvey should have stopped and questioned their evidence. Instead, they ignored this uncontroverted physical evidence and arrested him.

Before defendants arrested Wrubel, they knew that Picklo's 911 call was made at 6:55 p.m. They knew that Wrubel received his raincheck at 6:47 p.m. They knew that it was a three to five minute drive by golf cart from the clubhouse where Wrubel got the raincheck to the Turn Grill where the rape was committed. *See Defs. Mot. for Summ. J. Reply Br.,* at 5 ("[T]he ride to the turn grill via golf cart from the clubhouse is only a three to five minute ride...."). They had been told that Wrubel left his son alone *after* receiving his raincheck. They also knew that Bardelline called the clubhouse one or two minutes after the rapist left.

Putting these facts together, even in a light most favorable to the defendants, it was impossible for Wrubel to have committed the rape. The 911 call was logged in at 6:55 p.m. at the sheriff's department. To determine the time when the rape occurred, I note that some time[8] was taken before Bardelline called Picklo (Bardelline stated that she called the clubhouse "one or two minutes" after the rapist left), and I note that some time was taken by Picklo to react when Bardelline called from the Turn Grill, from which I conclude that the rape ended between 6:52 p.m. and 6:53

---

6. These include the identification by Picklo, Jason, and Zalewski.

7. HARVEY: ... did they say what time this was?

> BOUDREAU: Between 6:30, and, uhh... probably I'd have to say 6:50, from the people that [Wrubel is] talking about, the father and son that golfed, I know what time they had their raincheck for, and they said [Wrubel] left first.
> WRUBEL: Right.
> BOUDREAU: Problem is that when you left, you came back.
> WRUBEL: Came back to where?

BOUDREAU: Where the girl was.
WRUBEL: No, I never did, I, I left the golf course, I got the raincheck at 6:47 [holding up the raincheck]. My son and I went out to the cart, got my clubs off the cart, I took them to my pickup truck and I put them in there. *Wrubel Interrogation Tape,* 12:23a.m.

8. In my previous opinion dated November 21, 2001, cited at 173 F.Supp.2d 716, it is stated that "... at 6:55p.m., Picklo received a call from [Bardelline]." *Id.* at 719. This should be stated as follows: that the call from Picklo via 911 was logged at the sheriff's department at 6:55p.m.

p.m. Based on Bardelline's account and the rapist's difficulty in getting an erection, I conclude that the rape took at least three minutes and that the rape began at 6:49 p.m. or 6:50 p.m. Meanwhile, Wrubel having had his raincheck stamped at 6:47 p.m., in order to commit the rape, had to leave the clubhouse and get to his cart which I conclude at the earliest would be 6:48 p.m. Since the clubhouse is at least a three to five minute cart drive from the Turn Grill, it is clear that Wrubel could not have committed the rape.

■ Defendants now contend that they relied on Picklo's earlier statement to Clark that she saw Ryan alone *before* Wrubel came to her for the raincheck. According to this theory, Wrubel drove the golf cart from the Turn Grill to the clubhouse, dropped off Ryan, drove back to the Turn Grill, raped Bardelline, then drove back to the clubhouse to pick up the raincheck at 6:47 p.m.

This theory does not square with the rest of the evidence the sheriff's department had at the time of the arrest. According to Bardelline's testimony, she locked the door and called the clubhouse for help about "one or two minutes" after the rapist left. Locher Narrative Police Report, Pl. ex. O at 3. If Wrubel was indeed the rapist, he would be on his way to the clubhouse when Bardelline called the clubhouse. There is no evidence to support this. When Bardelline's call came in, Wrubel had already gotten his raincheck and was already packing his clubs away. It would defy the laws of physics for Wrubel to commit the rape, drive back to the clubhouse, stand in line, get the raincheck, correct the spelling of his last name, and be packing up his clubs within a span of "one or two minutes."

It is even more difficult to fathom how Wrubel would commit the rape, return to the clubhouse, stand in line to get a raincheck, and voluntarily offer to correct the spelling of his last name to the cashier![9] Such a fantastical theory, even when viewed in a light most favorable to the defendants, cannot support a finding of probable cause.

■ It is also troublesome that defendants relied so heavily on Picklo's description and disseminated her drawing to the news agencies the same afternoon that it was drawn. Their reliance was unreasonable. At the time of the rape, Picklo was only fifteen years old, and was understandably shaken by Bardelline's call. She was not a witness to the rape, and only identified Wrubel through Bardelline's vague descriptions. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (holding that police may not rely on informants indiscriminately, but must ascertain the "veracity" and "basis of knowledge" of the source through independent police investigation to support probable cause.). Accordingly, Picklo's descriptions, though detailed, cannot support probable cause.

B. *Failure to Seek an Arrest Warrant*

■ Moreover, I am also troubled that the sheriff's department never sought a warrant for Wrubel's arrest. They had sufficient and specific information to track him down: they had the correct spelling of his last name, a very detailed description of his appearance, a detailed drawing, the color and make of his truck, and a full 36 hours to seek a warrant for his arrest. They even had Wrubel's sister on the phone telling Boudreau that the suspect

---

9. Indeed, Harvey also found this theory unfathomable. In the beginning of the interrogation, he said he would bet money that Wrubel was not plaintiff's real name. Later in the interrogation, he asked Wrubel if it was consensual sex, presumably because it would not make any sense for a rapist to return to the clubhouse after the commission of the rape.

was her brother. Instead, the sheriff's department never sought the warrant, but broadcast Picklo's drawing and his name through various news agencies. And when Wrubel showed up at the police station to clear his name, they arrested him without a warrant.

The requirement for a warrant is foundational to the Fourth Amendment guarantee and is based on the principle that "the informed and deliberate determinations of magistrates empowered to issue warrants are to be preferred over the hurried action of officers who may happen to make arrests." *United States v. Ventresca*, 380 U.S. 102, 105, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (citations omitted).

The preference for a warrant is especially strong where, as in this case, the sheriff's department had 36 hours to deliberate on the evidence and had every opportunity to present their evidence before an independent magistrate but failed to do so. They had no pressure to make a hasty analysis of the facts, as in the case when the police are in hot pursuit of a fleeing felon, *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), or in the case of a burning fire, *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). Such exigent circumstances were not present here.

Moreover, Wrubel surrendered himself to the sheriff's department, waived his Miranda rights, and allowed his son to be interviewed. He presented no flight risk. It was unnecessary for the sheriff's department to arrest him in the middle of the night. The truth is, the sheriff's department never analyzed the evidence that Wrubel presented to clear his name. Defendants were so eager to crack this high-profile case that they never questioned

their *a priori* conclusion and did not follow the necessary protocols.[10] This is the type of zealous government intrusion that the Fourth Amendment seeks to prevent by involving a disinterested magistrate to determine probable cause.

## IV. CONCLUSION

Given the totality and reliability of the facts known to the arresting officers at the time of the arrest, the sheriff's department did not have probable cause to arrest Wrubel. In my earlier opinion in this case, I concluded that the defendants did not have qualified immunity and I conclude likewise in this opinion. Therefore, defendants violated Wrubel's constitutional rights and plaintiffs' motion for summary judgment is hereby GRANTED.

**IT IS SO ORDERED.**

---

10. For example, during the interrogation, Harvey said, "[t]his case is very important to the sheriff himself, my big boss. I got a lot of bosses in the department, but he's the big boss. It's important to him, and that's why we're here at 3 o'clock in the morning."